**SOUTH WINDSOR CONVALESCENT HOME, INC.**

v.

**Caspar W. WEINBERGER, Secretary of Health, Education and Welfare, et al.**

**Civ. No. H–74–250.**

United States District Court, D. Connecticut.

July 17, 1975.

---

Arnold W. Aronson, Hartford, Conn., for plaintiff.

Henry S. Cohn, Asst. U. S. Atty., Hartford, Conn., for defendants.

CLARIE, Chief Judge.

This action has been submitted to the Court on cross-motions for summary judgment, pursuant to Rule 56, Fed.R. Civ.P. The parties concede that there are no genuine issues of material fact remaining and that each is entitled to judgment as a matter of law. Upon reviewing the pleadings, the affidavits and all other papers filed, the Court finds the issues in favor of the plaintiff and accordingly grants summary judgment in favor of the plaintiff.

### Facts

The plaintiff, South Windsor Convalescent Home, Inc., has been a certified "provider" of skilled nursing services under the federally funded Medicare program since July, 1967. This health insurance program was primarily designed to provide post-hospital extended nursing care facilities for the aged. The administration of the program and the Federal Government funds are disbursed through state agencies and private organizations designated as fiscal intermediaries, pursuant to Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*

From the commencement of the plaintiff-provider's participation in this program in July 1967, until August 1, 1970, the federal regulations applicable to all Medicare-certified nursing homes, (20 C.F.R. Subpart D of part 405, §§ 405.-401–454, 31 Fed.Reg. 14808) authorized an accelerated depreciation of capital as-

sets as an approved accounting procedure for computing reimbursable costs. The accelerated method permits the usefulness of capital assets to be depleted at a faster rate in the earlier years than in the later years.

These nursing facilities were given the optional choice of using the straight-line, the declining balance or the sum-of-the-years digit method for depreciating these capital assets. No conditional provisions existed in the federal regulations then, which would authorize the Government at its discretion or otherwise, to recover at a later time, the accelerated depreciation deduction authorized on these items, if the nursing home should later decide to withdraw from the Medicare program. The plaintiff represents that the Social Security Administration not only approved, but encouraged the use of these accounting techniques, as an acceptable practice designed to encourage the building of new plant construction and the expansion of existing facilities. However, in 1969, more restrictive eligibility rules for beneficiary-users of these nursing homes were adopted by the Government, which caused a sharp drop in the number of Medicare patients eligible to be cared for under the program.

The federal regulations were also administratively amended to eliminate the provision, which allowed for an accelerated depreciation of those capital assets, which were acquired after August 1, 1970; and the amended regulations further provided that this accelerated method of depreciation could no longer be used by nursing facilities which were newly certified under the Medicare program after the effective date of the new regulation. Said regulation, in fact, went even further, by inserting a penalty provision which declared that if a nursing home terminated its participation in the Medicare program, after the August 1, 1970 date, (20 C.F.R. § 405.-415(d)(3) (1972)), the Government could recoup all past overpayments acquired by the "provider," through the

accelerated depreciation of its capital assets. Without any prior finding that these depreciation allowances were unreasonable, the fiscal intermediaries for the Government proceeded to take steps to recapture these allowances from those nursing homes that had withdrawn from the program. The plaintiff now claims that this attempt at an *ex post facto* enforcement of the new amendment to the regulations constituted an attempt to retroactively enforce a new regulation.

The parties agree that on October 1, 1971, the plaintiff nursing home voluntarily terminated its participation in the Medicare program. On July 12, 1972, the Government's fiscal intermediary, Travelers Insurance Company, notified the plaintiff that pursuant to 20 C.F.R. § 405.415(d)(3), it was requesting full payment of the $17,685.00, which represented the acclerated depreciation taken by the plaintiff in excess of the straight-line schedule of amounts for the fiscal years ending September 30, 1967 through September 30, 1971. Under threat of the Government's complete cutoff of federal financial participation in the Title XIX, program, the plaintiff paid back, under protest, its adjusted claim of $16,367.45. It is the plaintiff's present claim that the new "provider" reimbursement regulations, § 405.-415(d)(3) are void and unlawful. The plaintiff asserts that these new regulations do violence to the existing contract between the parties under the fifth amendment to the United States Constitution and deprive the plaintiff of its property without due process of law.

The Government's position, on the other hand, is that it was always implicit in its regulatory authorization permitting accelerated depreciation, that the provider must remain in the program for the entire period of the useful life of the assets being depreciated. The Government also claims that 42 U.S.C. § 1395x(v)(1), which calls for regulations to "provide for the making of suitable retroactive corrective adjustments" authorizes the depreciation re-

capture regulations which are now in question.

### Issue

Is the Government entitled to recapture what it now claims are cost charges in excess of actual costs, which were previously computed and allowed after audit, under the Government's own approved accelerated depreciation cost accounting methods, as a result of a subsequent amendment to the regulations, giving the Government a retroactive recoupment authority over depreciable assets, whose useful life had not yet been wholly depleted?

### Law

Under Title 42 U.S.C. § 1395x(v)(1)(A)(ii) Congress authorized the Secretary of Health, Education and Welfare to promulgate regulations defining items of allowable and reimbursable reasonable costs; and it further provided more specifically, that such regulations shall:

> "provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive."

From November 22, 1966 until August 1, 1970, the reimbursement regulations applicable to nursing homes, formally recognized the allowance of accelerated depreciation on capital assets, as a reasonable cost for reporting periods. In fact, nursing homes were authorized to elect one of three options: the straight-line depreciation, the declining balance or the sum-of-the-years-digit method of depreciation. A choice of these methods was permitted to be used on a single asset or group of assets; and a different method on other assets.

Fiscal intermediaries, such as the defendant, Travelers Insurance Company, were authorized by regulation to allow this accelerated depreciation as an element of reasonable cost, when determin-

ing final settlements with providers, at the end of each reporting period. Nothing in the existing regulations, prior to August 1970, authorized the Government to recoup any part of the previously audited and allowed depreciation on asset items as finally determined at the end of each reporting period. In no event was the Government given the right to recoup any such allowed depreciation, should the provider withdraw from the program prior to the itemized asset being fully depreciated.

On August 1, 1970, these reimbursement regulations were administratively amended, so as to limit the use of accelerated depreciation, as to those assets acquired after the effective date of the amendment. It also restricted previously acceptable accounting procedures, by declaring that if a provider terminated its affiliation with the program after the effective date of the amended regulations, the Government would be entitled to recoup the difference between the depreciation taken under the accelerated formula and the straight-line method of depreciation, as an overpayment; 20 C. F.R. § 405.415(d)(3) 1972. The latter regulation provides:

> "When the provider who has used an accelerated method of depreciation with respect to any of its assets terminates participation in the program, or where the health insurance proportion of its allowable costs decreases so that cumulatively substantially more depreciation was paid than would have been paid using the straight-line method of depreciation, the excess of reimbursable cost, determined by using accelerated depreciation methods and paid under the program over the reimbursable cost which would have been determined and paid under the program by using the straight-line method of depreciation will be recovered as an offset to current reimbursement due or, if the provider has terminated participation in the program, as an overpayment. In this determination of excess payment, recog-

nition will be given to the effects the adjustment to straight-line depreciation would have on the return on equity capital and on the allowance in lieu of specific recognition of other costs in the respective years."

Prior to August 1, 1970, the Medicare regulations neither qualified a provider's use of accelerated depreciation nor provided for recapture of any portion of such charges taken by a provider. The only retroactive adjustment previously authorized applied to billings for interim monthly payments which were declared to be subject to adjustments for overpayments or underpayments; but at the end of each reporting period the final reimbursable cost amount would be determined by audit. If the Government had intended to reserve the right to recoup accelerated depreciation items, if the "provider" should withdraw from the program during the useful life of any such assets, it would have been a simple matter to have said so in the original regulation.

The Health, Education, and Welfare Agency with a full comprehension of Congressional policy, as it related to the reimbursement principles of the Social Security Act, had declared in the regulation as originally promulgated, that accelerated depreciation of such capital assets was a reasonable and allowable cost deduction; and this was confirmed at the time of final audit for the fiscal years ending September 30, 1967 through August 1, 1970, the effective date of the amended regulation.

To change the rule now and attempt to reopen the audit approved amounts, constitutes an *ex post facto* redetermination of allowable costs. The agency had promulgated these regulations, which defined accelerated depreciation as an acceptable actual cost item; it had also declared it to be a reasonable cost item for providing services to health insurance beneficiaries covered under Title XVIII of the Act. This depreciation allowance is distinguishable from the depreciation principles normally asscribed to the useful life of the depreciable assets under the federal tax statutes. Title 20 C.F.R. § 405.417 makes clear that difference:

"(b) *Application.* Depreciation is allowable on assets being used at the time the provider enters into the program. This applies even though such assets may be fully depreciated on the provider's books or fully depreciated with respect to other third-party payers. So long as an asset is being used, its useful life is considered not to have ended, and consequently the asset is subject to depreciation based upon a revised estimate of the asset's useful life as determined by the provider and approved by the intermediary. Correction of prior year's depreciation to reflect revision of estimated useful life should be made in the first year of participation in the program unless the provider has used the optional method (§ 405.416), in which case the correction should be made at the time of discontinuing the use of that method. . . ."

The defendants argue that regardless of the method of depreciation used, two factors remain constant, the value of the assets at the beginning of the depreciation period and the life use period. The overall payments are designed to ultimately equate with the capitalization base as established. The defendant contends that a "provider" entering the program when the assets are new, uses the accelerated depreciation and should it thereafter terminate its participation in the program prior to the time, when average depreciation (the straight-line) rate would be paid, Medicare would, in the absence of the amended recoupment rule, be paying a disproportionate share toward the depreciation of the provider's assets. On the other hand, it should be emphasized, that had the "provider" terminated its affiliation with Medicare and sold its business prior to the effective date of the amended recoupment regulation, no such alleged over-payment could then have been recovered.

The attempted application of the rule is contrary to the guidelines promulgated for the time period within which the Government now seeks retroactive reimbursement. The plaintiff relied upon those rules governing the determination of the reasonable cost of services rendered. The defendants' present attempt to retroactively try to recapture accelerated depreciation, amounts to an attempt to appropriate *ex post facto* the plaintiff's earned property right, in violation of the fifth amendment to the United States Constitution.

The Act only contemplated a retroactive adjustment of the interim payments, which were based upon the provider's original estimated costs. However, once the fixed reasonable cost liability had been determined after the Agency's audit, in the absence of fraud or mistake, the adjusted and approved allowance should stand. The Government argues that even if the amended regulation had not been adopted, previously allowed accelerated depreciation after audit could still be recoverable by a subsequent determination of its unreasonableness, under generally accepted accounting rules.

The amended controversial regulation, 20 C.F.R. § 405.15(d)(3), was obviously designed as a deterrent against those providers who might be tempted to terminate their continued participation in the Medicare program through the imposition of a monetary punishment should they elect to do so. Title 42 U.S.C. § 1359x(v) is the source of the authority for this regulation and it does not authorize the Secretary to make retroactive corrective cost adjustments because of the act of termination. Such adjustments are only authorized where it is found that there exist economically inappropriate "methods of determining costs"; no such findings have been made here.

"Retrospective legislation is generally not favored by the courts and where there is an open question of construction of a statute with respect to

whether it should be applied retrospectively it will only be so applied where it clearly does not impinge upon constitutional protection. *Duke Power Co. v. South Carolina Tax. Comm.*, 4 Cir., 81 F.2d 513, 516. And it is a sound principle of constitutional law that retroactive legislature in general will not be allowed to impair rights which can truly be said to be *vested* rights of a nature constituting property rights. *Lynch v. United States*, 292 U.S. 616, 54 S.Ct. 641, 78 L.Ed. 1434; *Ettor v. City of Tacoma,* 228 U.S. 148, 156, 33 S.Ct. 428, 57 L.Ed., 773 . . . ." *Seese v. Bethlehem Steel Co.*, 74 F.Supp. 412, 417 (D.Md. 1947).

This controversy does not involve a disagreement over the provider's interim reimbursement cost report; the resolution of such an issue would be cognizable and provided for under the rules. Such a dispute would call for an audit and an administrative hearing on the question of a reimbursement determination under Title 20 § 405.490 *et seq.*, C.F.R. That kind of issue would authorize a reopening, a redetermination or correction by the intermediary, at any time within three (3) years from the original notice of program reimbursement or hearing decision. What we have here, on the other hand, is a unilateral change in administrative policy, after the reporting period audit had been finalized and the plaintiff's rights vested.

As a matter of policy, the Supreme Court has generally upheld a reasonable measure of retroactivity in administering the impact of Income Tax Statutes. It has found that the reasonableness of retroactivity may revert back to the commencement of the calendar year in which the statute was enacted.

"As respects income tax statutes, it long has been the practice of Congress to make them retroactive for relatively short periods so as to include profits from transactions consummated while the statute was in process of en-

actment, or within so much of the calendar year as preceded the enactment; and repeated decisions of this Court have recognized this practice and sustained it as consistent with the due process of law clause of the Constitution." *United States v. Hudson,* 299 U.S. 498, 500, 57 S.Ct. 309, 310, 81 L. Ed. 370 (1937).

*Also* see, *Shanahan v. United States,* 447 F.2d 1082, 1084 (10th Cir. 1971).

Had the Government elected to reserve the right to recapture cost adjustments on any part of the authorized accelerated depreciation items, should the plaintiff later decide to terminate its participation in the program, while still possessing assets which had not been fully depreciated, it could have provided for this contingency when it adopted the regulations. It chose not to do so. Absent such a provision in the regulations, to adopt such a principle at this late date and apply it in a retroactive manner, would leave the interest of the providers in securing payment for their services completed unprotected, whenever such questions might arise.

In an analogous situation where the Secretary attempted to recoup the payment of charges for items or services after a final determination of costs, the District Court said,

"The challenged regulations were applied in this case to recoup payments made to plaintiff between 1966 and 1972 for items or services subsequently alleged to be excluded from Medicare coverage by Section 1862(a).

. . . . . .

"Because of the view we take on the issue of statutory authority, we need not reach the question of the constitutionality of the suspension regulations. Mount Sinai is entitled to judgment on the merits and to a permanent injunction prohibiting unauthorized efforts by the Secretary or his agents to recoup Medicare payments the hospital received prior to January 1, 1972, on the basis of a subsequent determination that the items or services rendered were excluded from Medicare coverage by Section 1862(a) of the Act." *Mount Sinai Hosp. of Greater Miami, Inc. v. Weinberger,* 376 F.Supp. 1099, 1134–1136 (S.D.Florida 1974).

"Appellee is not penalized for anything it did in the past. The new Act applies prospectively only. So there is no possible due process issue on that score. As stated in *Fleming v. Rhodes,* 331 U.S. 100, 107, 67 S.Ct. 1140, 1144, 91 L.Ed. 1368 'Federal regulation of future action based upon rights previously acquired by the person regulated is not prohibited by the Constitution. So long as the Constitution authorizes the subsequently enacted legislation, the fact that its provisions limit or interfere with previously acquired rights does not condemn it. Immunity from federal regulation is not gained through forehanded contracts.' " *F. H. A. v. Darlington, Inc.,* 358 U.S. 84, 91, 79 S.Ct. 141, 146, 3 L.Ed.2d 132 (1958) (footnote omitted).

As Justice Holmes so well expressed the law in a divided opinion of the Supreme Court in *Blodgett v. Holden,* 275 U.S. 142, 149, 48 S.Ct. 105, 107, 72 L.Ed. 206 (1927), (as modified in 276 U.S. 594, 48 S.Ct. 105, 72 L.Ed. 206 (1928):

" . . . I think it tolerably plain that the Act should be read as referring only to transactions taking place after it was passed, when to disregard the rule 'would be to impose an unexpected liability that if known might have induced those concerned to avoid it and to use their money in other ways.' "

This Court, following the principle applied in tax cases, finds that Medicare regulation 20 C.F.R. § 405.-415(d)(3) is unconstitutional as applied to the plaintiff. The amended regulation seeks to recapture reimbursement for accelerated depreciation charges, which were authorized and lawfully taken prior to the commencement of the calendar year in which the regulation

**522**

was adopted and promulgated. Since the effective date of the regulation was August 1, 1970, (§ 405.415(h)), the Court finds that the accrued charges which were recouped by the defendants for the period prior to January 1, 1970, are unconstitutional, under the due process clause of the fifth amendment to the United States Constitution. *See, Hazelwood Chronic and Convalescent Hospital v. Weinberger*, Civil No. 73–210 (D.Oregon, March 26, 1974).

The defendants may not lawfully recapture reimbursements for accelerated depreciation taken by the plaintiff from June 29, 1967 through December 31, 1969. Charges recouped subsequently, commencing with January 1, 1970, are found to be lawful. The parties shall compute and submit a proposed final judgment as to the amounts due the plaintiff, so as to carry out the findings of this decision. So ordered.