**ADAMS NURSING HOME OF WILLIAMSTOWN, INC., Plaintiff, Appellee,**

v.

**F. David MATHEWS, Secretary of Health, Education and Welfare, et al., Defendants, Appellants.**

**No. 76–1212.**

United States Court of Appeals, First Circuit.

Feb. 2, 1977.

John K. Villa, Atty., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., with whom Rex E. Lee, Asst. Atty. Gen., Washington, D. C., James N. Gabriel, U. S. Atty., Boston, Mass., Robert E. Kopp and Judith S. Feigin, Attys., Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., were on brief, for defendants, appellants.

Thomas C. Fox, Washington, D. C., with whom Kearons J. Whalen and Reder & Whalen, Pittsfield, Mass., were on brief, for plaintiff, appellee.

Before COFFIN, Chief Judge, and McENTEE and CAMPBELL, Circuit Judges.

COFFIN, Chief Judge.

In the court below, appellee, Adams Nursing Home of Williamstown, Inc. (Adams), obtained an injunction preventing the enforcement of a Medicare regulation issued by the Secretary of Health, Education and Welfare (Secretary). Some background is necessary to an understanding of the case. Medicare[1] is administered by a combination of private and governmental entities. Those eligible for Medicare benefits are given treatment by a qualified "provider of services"; the provider is paid, not by the patient, but by a federal trust fund. 42 U.S.C. § 1395g. Payment is frequently made through "fiscal intermediaries", private organizations acting under contracts with the Secretary. 42 U.S.C. § 1395h. Fiscal intermediaries also conduct audits of providers and otherwise assist in administering the Medicare program.

Providers are ordinarily paid the "reasonable cost" of their services. 42 U.S.C. § 1395b. The Secretary is authorized to issue regulations refining the meaning of "reasonable cost"; he must ensure that Medicare payments do not subsidize private patients and that private patients do not bear any of the costs of Medicare services. 42 U.S.C. § 1395x(v)(1)(A)(i). As might be expected, determining the "reasonable cost" of capital assets is a major source of uncertainty, and as soon as the program was under way the Secretary issued regulations to deal with the problem. His original rules allowed providers to depreciate any capital assets used to serve Medicare patients and to treat the depreciation as a cost of providing care. Between November, 1966, and August, 1970, the method of computing depreciation was left largely to the provider; providers could choose straight line depreciation or some form of accelerated depreciation. Straight line depreciation yields an even flow of reimbursement payments during the expected life of the asset, while accelerated depreciation produces larger payments in the early years and smaller ones toward the end of the asset's life. In 1970, the Secretary decided to restrict the future use of accelerated depreciation. He also issued a regulation designed to "recapture" the difference between accelerated and straight line depreciation when providers using the accelerated method left the program.[2]

Adams was a provider between 1967 and 1972. During this period it took accelerated depreciation on some assets. When the nursing home withdrew from the program, its fiscal intermediary applied the recapture regulation and claimed that Adams owed the program $4,739 for depreciation taken in 1967, 1968, and 1969. Adams brought this suit to enjoin the Secretary from collecting the asserted debt. The Secretary asks us to overturn the district court's injunction; he attacks the court's jurisdiction as well as its decision on the merits. We reject the jurisdictional challenge, but reverse on the merits.

In his jurisdictional argument, the Secretary claims that he is shielded from judicial intervention by 42 U.S.C. § 1395ii, which incorporates 42 U.S.C. § 405(h). The incorporated section says:

**1.** Medicare is known formally as Health Insurance for the Aged and Disabled, 42 U.S.C. §§ 1395–1395pp.

**2.** The regulation reads as follows:

"When a provider who has used an accelerated method of depreciation with respect to any of its assets terminates participation in the program, or where the health insurance proportion of its allowable costs decreases so that cumulatively substantially more depreciation was paid than would have been paid using the straight-line method of depreciation, the excess of reimbursable cost, determined by using accelerated depreciation methods and paid under the program over the reimbursable cost which would have been determined and paid under the program by using the straight-line method of depreciation will be recovered as an offset to current reimbursement due or, if the provider has terminated participation in the program, as an overpayment. In this determination of excess payment, recognition will be given to the effects the adjustment to straight-line depreciation would have on the return on equity capital and on the allowance in lieu of specific recognition of other costs in the respective years." 20 C.F.R. § 405.415(d)(3) (1975).

"The findings and decisions of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 41 of Title 28 to recover on any claim arising under this subchapter."

This is a provision of the Social Security Act, and in most cases it merely requires a claimant to exhaust his administrative remedies before seeking judicial relief, which is made available by 42 U.S.C. § 405(g). But section 405(g) is not fully incorporated into the Medicare subchapter. *See* 42 U.S.C. § 1395ii. That subchapter permits judicial review when the Secretary disqualifies providers of services, 42 U.S.C. § 1395ff(c), but decisions about the amount of reimbursement due to a provider are not explicitly made reviewable.[3]

Adams argues that this court has jurisdiction nonetheless, relying primarily on the judicial review provisions of the Administrative Procedure Act, 5 U.S.C. §§ 701–706.[4] Our circuit has treated these provisions as an independent grant of jurisdiction. *Bradley v. Weinberger*, 483 F.2d 410, 413 (1st

Cir. 1973). The provisions operate only when several requirements have been met. If judicial review has not been expressly authorized by statute, courts may review only "final agency action for which there is no other adequate remedy in a court". 5 U.S.C. § 704. And judicial review is barred when "agency action is committed to agency discretion by law" or when it is precluded by statute. *Id.* § 701(a). Of these possible barriers, the government relies solely on the last.[5] It argues that 42 U.S.C. § 405(h) precludes review. The literal words of § 405(h), however, do not restrict jurisdiction based on the Administrative Procedure Act; they deal only with jurisdictional grants contained in title 28. *See generally Ruiz-Olan v. Secretary, Department of Health, Education and Welfare*, 511 F.2d 1056, 1058 (1st Cir. 1975).

The government finds support for its position in *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In *Salfi*, the Supreme Court held that federal question jurisdiction under 28 U.S.C. § 1331 is barred by § 405(h), a result that is consistent with a literal reading of § 405(h). This holding was apparently limited to cases in which judicial review could be obtained by other means. 422 U.S. at 762, 95 S.Ct. 2457. We do not think that *Salfi* restricts our jurisdiction over this case. Several other courts have also reached a similar conclusion.[6] *Sanders v. Weinberger*,

3. In 1972, Congress filled the gap in the statute by creating a Provider Reimbursement Review Board to settle disputes of this sort. 42 U.S.C. § 1395oo. The Board's decisions may be reviewed, 42 U.S.C. § 1395oo (f)(1), but the Board apparently hears only disputes arising from accounting periods ending on or after June 30, 1973. 42 U.S.C.A. § 1395oo, Historical Note. Thus the act creating the Board comes too late for Adams, which withdrew from the Medicare program in March, 1972.

4. Adams also asserts that jurisdiction is available under 28 U.S.C. § 1331. It attempts to avoid *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), by arguing that 42 U.S.C. § 405(h) does not cover this case because the nursing home is not trying "to recover on any claim" against the program; it is simply forestalling the government's effort to recover a claim. This argument founders on the requirement that $10,000 be in controversy before jurisdiction may be taken under § 1331. *But cf.* Pub.L. 94–574, 90 Stat. 2721 (1976).

Adams believes that more than its $4,739 is in dispute, because the Secretary may suspend Medicaid payments to Adams if the nursing home does not return the excess Medicare depreciation. The parties have addressed this question only fleetingly in their briefs, and because we find an alternative source of jurisdiction we need not pursue the matter further.

5. Nor do we see any obstacles to our jurisdiction in the other requirements. The most worrisome is the exception for action committed to agency discretion, but the Supreme Court has sharply limited the scope of this exception. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). *But cf. St. Louis Univ. v. Blue Cross Hosp. Serv.*, 537 F.2d 283, 289–91 (8th Cir. 1976), *cert. denied*, —— U.S. ——, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976).

6. The Ninth Circuit, on the other hand, has suggested that *Salfi* does have implications for

522 F.2d 1167, 1171 (7th Cir. 1975), *cert. granted,* 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 829 (1976); *Hunt v. Weinberger,* 527 F.2d 544, 546–47 (6th Cir. 1976); *Lejeune v. Matthews,* 526 F.2d 950, 952–53 & n.2 (5th Cir. 1976); *Whitecliff, Inc. v. United States,* 536 F.2d 347, 349–51 (Ct.Cl.1976). *See also South Windsor Convalescent Home, Inc. v. Mathews,* 541 F.2d 910, 913 n.3 (2d Cir. 1976). *But cf. St. Louis Univ. v. Blue Cross Hosp. Serv.,* 537 F.2d 283 (8th Cir. 1976), *cert. denied,* —— U.S. ——, 97 S.Ct. 484, 50 L.Ed.2d 584 (1976).[7]

■ Turning to the merits, we face the argument, accepted by the district court, that the Secretary's "recapture" regulation violates the Fifth Amendment's guarantee of due process.[8] The district judge relied on the decisions of several other courts. *South Windsor Convalescent Home, Inc. v. Weinberger,* 403 F.Supp. 515 (D.Conn.1975), *rev'd for lack of jurisdiction,* 541 F.2d 910 (2d Cir. 1976); *Springdale Convalescent Center v. Mathews,* Civ. No. 75–1562A (N.D.Ga.1975); *Hazelwood Chronic and Convalescent Center v. Weinberger,* Civ. No. 73–210 (D.Ore.1974), *rev'd,* 543 F.2d 703 (9th Cir. 1976); *Hutchison Nursing Home, Inc. v. Burns,* 236 N.W.2d 312 (Sup.Ct.Iowa 1975), *cert. denied,* 426 U.S. 945, 96 S.Ct. 3163, 49 L.Ed.2d 1182 (1976). The theme of these cases is that the recapture regulation

overturns vested property rights and is therefore an invalid retrospective act.

■ Retrospective laws are often viewed with some suspicion. *Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976). This suspicion is grounded in some of the same considerations underlying the notion that legislatures should not "adjudicate" the rights of known individuals. *Cf. United States v. Brown,* 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965). No such problem infects this regulation, however, for when it was instituted the Secretary could not know which providers would be forced to disgorge depreciation payments. But a second purpose is more commonly invoked: laws that unsettle settled rights can be harsh, and they deserve a special scrutiny. This principle has received explicit constitutional recognition in the taking and contract clauses. *See Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922); *El Paso v. Simmons,* 379 U.S. 497, 85 S.Ct. 577, 13 L.Ed.2d 446 (1965). Of course, not every law that upsets expectations is invalid; courts have generally compared the public interest in the retroactive rule with the private interests that are overturned by it. Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv.L.Rev. 692, 697 (1960). *See Usery v. Turner Elkhorn Mining Co., supra; South*

---

jurisdiction based on the Administrative Procedure Act. *Hazelwood Chronic and Convalescent Hosp., Inc. v. Weinberger,* 543 F.2d 703 (9th Cir. 1976). The *Hazelwood* court arrived at this view only by going behind the Supreme Court's opinion to discover that the plaintiffs in *Salfi* had alleged jurisdiction under the Administrative Procedure Act as well as under 28 U.S.C. § 1331. The language of *Salfi* provides only ambiguous support for the Ninth Circuit's view *compare Salfi, supra,* 422 U.S. at 753, 95 S.Ct. 2457 *with id.* at 764, 95 S.Ct. 2457. And the Supreme Court itself apparently thinks that the question is still open, for the Court has granted *certiorari* to answer it. *Sanders v. Weinberger, supra,* 426 U.S. 905, 96 S.Ct. 2225, 48 L.Ed.2d 829. Moreover, we have recently been warned not to read too much into cases that seem to decide issues by implication without directly addressing them. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

7. We reach this conclusion with some trepidation. The Supreme Court has granted *certiorari* on this question, *see* note 6 *supra,* and ordinarily we would await the Court's final decision. In this case, however, we cannot justify the delay. For if the Court confirms our jurisdiction, Adams will lose on the merits, and if the Court denies our jurisdiction, Adams will lose on that ground. To provide the parties with a prompt and conclusive decision, we follow the consistent direction of our past cases and affirm the district court's assumption of jurisdiction.

8. Appellee also argues that the recapture regulation is not a proper rule because, by statute, rules must have a "future effect". 5 U.S.C. § 551(4). Since, as we discuss below, the recapture of depreciation payments is triggered by events occurring after the rule was issued, this argument fails even on its own terms.

*Terminal Corp. v. EPA,* 504 F.2d 646, 680 (1st Cir. 1974). Putting aside any attempt to tailor the conclusory label "vested right" to fit Adams' depreciation payments, and inquiring instead into Adams' actual expectations and the reasonableness of those expectations, we find that only a modest private interest is affected by the Secretary's rule. In any retroactivity challenge, a central question is how the challenger's conduct, or the conduct of others in his class, would have differed if the law in issue had applied from the start. If the recapture rule had been laid down in 1966, those providers who planned to stay in the program would not have changed their behavior significantly. In the long run there is no difference between accelerated and straight line depreciation; higher payments generated by the accelerated method in early years are recouped by reduced payments later.[9] Although Adams now claims that it would have chosen straight line depreciation if it had foreseen the recapture regulation, the regulation is designed to leave Adams no better—and no worse—off than if the nursing home had chosen the straight line method in the first place.[10]

The rule has a greater impact on the expectations of those who planned from the start to take advantage of accelerated depreciation by quitting the program while they were still ahead. Providers with plans of this sort were adversely affected by the new rule; they might not have joined the program at all if the regulation had been in effect in 1966. While such an expectation may not be wholly illegitimate, it would seem to have nothing to recommend it other than the traditional desire to take advantage of a loophole. More important, any expectation these providers had must have been discounted by an awareness that they were joining a new government program, subject to ongoing regulation by the Secretary. Earlier statutes and regulations did not unequivocally permit Medicare providers to quit and keep the benefits of accelerated depreciation,[11] and Adams does not suggest that the government gave informal assurances to providers on this point. When providers joined the new program, they knew that "small repairs" in the regulatory scheme were likely. *Cf. Danforth v. Groton Water Co.,* 178 Mass. 472, 477, 59 N.E. 1033 (1901) (Holmes, C. J.). And courts have recognized that the expectations of those who enter a regulated field are diluted by the knowledge that occasional changes will be made to better carry out regulatory purposes. *Federal Housing Administration v. Darlington, Inc.,* 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958).[12]

9. We recognize that there are some differences between the methods, even for those looking to the long run. Cash flow can be very important to any business, and accelerated depreciation provides a large cash flow at a critical time. However, the recapture regulation does not deprive Adams of an advantageous cash flow; Adams has already reaped that benefit.

10. Again, there are slight differences in cash flow. Adams expected the large early payments to be recouped gradually over the life of the asset, while the regulation recaptures the payments in a single lump sum. But Adams could obtain the benefits of gradual recoupment by staying in the program. We do not think that these cash flow differences amount to a constitutionally significant interest.

11. The Secretary was under a statutory duty to write regulations that would prevent Medicare from subsidizing nonMedicare patients. Pub.L. 89–97, § 1861(v)(1)(A), 79 Stat. 286, 323 (1965). Moreover, he was empowered to make "suitable retroactive corrective adjustments . . . for any fiscal period" when reimbursements

proved excessive. *Id.* § 1861(v)(1)(B). *See also id.* § 1815. While we are not persuaded that these provisions alone authorize a retroactive regulation of this sort, *see* pp. 1082–1083 *infra,* they should have given the providers warning that any plan to reap a quick profit from the program might easily go awry.

12. The decisions on which the district court relied take a different view of the providers' interest. These decisions treat the large accelerated depreciation payments as accurate estimates of the providers' actual costs in the early years. Beginning with this premise, they analyze the regulation as though it were no different from a regulation declaring that, because the Secretary failed to consider possible bulk purchase discounts in computing the cost of medicine, he intended to retroactively reduce all payments made for medicine in past years. A rule of this sort would be far more troubling, but we think the present case is distinguishable. First, depreciation is not an easy cost to compute; it is unavoidably artificial. We are not inclined to substitute our notions of proper cost accounting for those of the Secretary,

Against this minor interest stands the Secretary's desire to remedy a perceived abuse of the Medicare program. In his view, accelerated depreciation exaggerates the true cost of providing services. Allowing providers to leave the program without repaying the difference between accelerated and straight line depreciation would, he believes, unjustly enrich private patients at the expense of the Medicare program.[13] If this abuse could be cured by a purely prospective rule, the Secretary's retroactive solution would get less deference. But we see no way to avoid some retroactive impact if the Secretary's purpose is to be achieved. We note the principle that the government's interest has less weight when a retrospective law frees the government itself, rather than private parties, from obligation. *See Perry v. United States,* 294 U.S. 330, 350–51, 55 S.Ct. 432, 79 L.Ed. 912 (1935); *Lynch v. United States,* 292 U.S. 571, 576–77, 54 S.Ct. 840, 78 L.Ed. 1484 (1934). Nonetheless, the government here is entitled to the benefit of any constitutional doubts we may have. *Usery v. Turner Elkhorn Mining Co., supra.* We conclude that the Secretary's interest must prevail; the regulation is constitutional.

Adams argues that, even if constitutional, the regulation exceeds the Secretary's statutory authority. Adams draws a negative inference from a statute requiring the Secretary to make retroactive adjustments "for any fiscal period" in which overpayments have been made. 42 U.S.C. § 1395x(v)(1)(A)(ii). Adams argues persuasively that this provision was meant to allow a payment system in which estimated costs are paid at frequent intervals and adjustments between actual and estimated costs are made at longer intervals. Because the Secretary has apparently chosen to make final adjustments every year, he has some difficulty justifying his recapture regulation—which goes back several years—under this provision. Several courts have read this section as a limit on the Secretary's power to reopen years in which a final settlement has already been made. *South Windsor Convalescent Home, Inc. v. Weinberger, supra; Mount Sinai Hosp. v. Weinberger,* 376 F.Supp. 1099, 1126–36 (S.D.Fla.1974), *rev'd,* 517 F.2d 329 (5th Cir. 1975); *Columbia Heights Nursing Home and Hosp., Inc. v. Weinberger,* 380 F.Supp. 1066 (M.D.La.1974). While we agree that this provision is not a broad grant of authority to impose retroactive rules, other provisions give the Secretary authority to issue "such regulations as may be necessary to carry out the administration of the insurance programs." 42 U.S.C. § 1395hh. *See also* 42 U.S.C. § 1395x(v)(1)(A). In this case, we do not think that the Secretary's general power is limited by the specific grant.[14] *See Hazelwood Chronic and Con-*

even—perhaps especially—when experience in administering the program leads him to correct his original approach. Second, the advantages of accelerated depreciation are merely temporary for most providers. Unlike the payments in our hypothetical above, accelerated depreciation payments are more a loan than a gift, at least for long-haul providers.

13. A simple example illustrates the Secretary's reasoning. Suppose a provider buys an asset with a ten year useful life and uses it exclusively for Medicare patients in the first five years. In that time, accelerated depreciation payments will supply two-thirds of the total cost of the asset. If the provider then leaves the program and serves only private patients thereafter, the patients will constitute half the total number served, but they will pay only a third of the cost.

14. Although to reach this result we must reject the reasoning of the *South Windsor* court, the other cases cited by Adams are distinguishable.

In both *Columbia Heights* and *Mount Sinai,* the government sought to recover from providers payments for services that were not covered by Medicare. In each case, the provider had long treated the services as covered without objection from the fiscal intermediary. Moreover, the provider could have corrected the mistake at no great cost if it had been notified earlier, but by the time the government acted, it was too late for the provider to collect from the patients, who were ultimately liable. The Secretary was on weaker constitutional ground in those cases, *cf.* note 12 *supra,* and the courts avoided the constitutional question by a strict reading of the Secretary's statutory powers. Because of the differences between accelerated depreciation payments and ordinary cost reimbursements, we do not think such a narrow view of the Secretary's powers is necessary in this case.

*valescent Center v. Weinberger, supra,* 543 F.2d at 707–08.

*Reversed.*