HEMPSTEAD GENERAL HOSPITAL, Hempstead Park Nursing Home, and East Rockstead Associates, Plaintiffs,

v.

Robert P. WHALEN, as Commissioner of Health of the State of New York, Philip L. Toia, as Commissioner of Social Services of the State of New York, Hugh L. Carey, as Governor of the State of New York, David Matthews, as Secretary of the U.S. Department of Health, Education and Welfare and the Church Charity Foundation of Long Island, Defendants.

No. 76 C 2282.

United States District Court,
E. D. New York.

Aug. 3, 1979.

Hayt, Hayt & Landau by Robert A. Wild, Great Neck, N.Y., for plaintiffs.

Cullen & Dykman, Brooklyn, N.Y., for Church Charity Foundation.

Robert Abrams, Atty. Gen. of State of N.Y. by Charles A. Bradley, Sp. Asst. Atty. Gen., New York City, Edward R. Korman, U.S. Atty., E.D.N.Y. by Cyril Hyman, Brooklyn, N.Y., for defendants.

## MEMORANDUM AND ORDER

GEORGE C. PRATT, District Judge.

### I. *INTRODUCTION*

In this action plaintiffs challenge the constitutionality of certain New York State Medicaid regulations, claiming that they (1) are inconsistent with federal law, (2) violate the Supremacy Clause, and (3) deprive plaintiffs of their property without due process of law. Plaintiffs seek both declaratory and injunctive relief compelling the state defendants to approve an application made by the defendant Church Charity Foundation to purchase a health-care facility now owned and operated by plaintiffs.

Plaintiffs have moved for summary judgment, relying on extensive briefs, affidavits and a statement pursuant to E.D.N.Y. General Rule 9(g) of material facts alleged not to be in dispute. Defendants submitted no

papers in opposition to the motion other than two brief affidavits which contain some discussion of the facts and brief discussion of the relevant law. It appeals clear from all of the papers filed that the essential facts are not disputed.

## II. FACTS

Plaintiffs are three partnerships which own and operate two health-care facilities collectively known as Hempstead General Hospital Medical Center (medical center), consisting of Hempstead General Hospital (hospital), a general care facility which plaintiffs have owned and operated since 1956, and Hempstead Park Nursing Home (nursing home), a skilled nursing facility immediately contiguous to the hospital, which plaintiffs have owned and operated since 1966.

The state and federal defendants are individuals charged in their official capacities with promulgating and implementing the statutes and regulations involved in this lawsuit.

Also named as a defendant is the proposed purchaser of the medical center, The Church Charity Foundation of Long Island (CCF), a charitable organization which owns and operates, on a voluntary and not-for-profit basis, three hospitals and several other health-care facilities in the metropolitan New York area.

In 1973, plaintiffs decided to sell the medical center to a charitable community organization, thereby changing the center from a private health-care facility to one operated on a voluntary, not-for-profit basis. Negotiations were initially had with a local civic group that had been organized as

a not-for-profit corporation for the purpose of acquiring the medical center. When CCF became interested in purchasing the medical center, however, the local civic group withdrew from the proposed transaction. Since the medical center derives much of its income from Medicare, Medicaid, and Blue Cross and Blue Shield of Greater New York (Blue Cross),[1] plaintiffs and CCF structured their negotiations and preparation for the proposed sale with a view to the government regulations[2] and the requirements of those health-care plans.

In December 1974, CCF filed with the New York State Department of Health a formal application to purchase and operate the medical center with copies forwarded for review to the Long Island Health and Hospital Planning Council, the Nassau-Suffolk Comprehensive Health and Hospital Planning Council, and the New York State Hospital Review and Planning Council. On February 28, 1975, the Long Island and Nassau-Suffolk councils recommended approval of CCF's application, with the sales price to be based upon an independent appraisal.

As of July 1, 1975 an independent appraiser placed the value of the medical center at $12,929,000;[3] plaintiffs and CCF thereupon initially agreed to a purchase price of approximately $12,500,000. On July 31, 1975 the New York State Hospital Review and Planning Council recommended approval of the application contingent, however, upon a determination by the Department of Health that the proposed transaction would be financially feasible.[4] In the meantime, plaintiffs satisfied two other Department of Health prerequisites to the proposed transfer: "structural deficiencies"

---

1. At the times in question, Blue Cross was the Medicare fiscal intermediary for most metropolitan New York voluntary hospitals, including those already owned and operated by CCF. As fiscal intermediary, Blue Cross was "responsible for paying the bills of beneficiaries for covered services received in participating hospitals and other institutions under the medicare program." 42 CFR § 405.401(c) (1978).

2. See Part III, *infra*.

3. Plaintiffs assert that as of August 1, 1975, the replacement costs of the medical center exceeded $30,000,000. Defendants do not dispute this figure.

4. The application was approved by these councils, in part because it furthered an acknowledged goal of replacing the proprietary owner of a health care facility with a not-for-profit sponsor who would devote all derived income to the facility rather than operate for private gain.

in the medical center's facilities were corrected and certain renovations made; and unsettled accounts between HEW and the center were resolved, with respect to the latter's indebtedness to the Medicare program.

Under Article 28 of the New York State Public Health Law no hospital or nursing home may be "established" without the written approval of the New York State Public Health Council. New York Public Health Law § 2801–a(2). At a November 21, 1975 meeting, the Public Health Council deferred making a final decision on CCF's application, citing as reasons the high purchase price of approximately $12,500,000 and the view that plaintiffs may have been trying to take advantage of CCF. Plaintiffs and CCF subsequently negotiated a new reduced purchase price of $10,350,000, with plaintiffs to participate in financing the transaction by accepting a large long-term mortgage at a relatively low 6% interest rate.[5]

In a report dated January 15, 1976, the staff of the Department of Health found that the requirements of Public Health Law § 2801–a(3) had been met in that there was a public need for the transfer of ownership; the character, competence and standing of CCF in the community was satisfactory; and CCF had adequate financial resources and sources of future revenue to render the proposed transfer "financially feasible". The staff report, therefore, recommended approval of CCF's application.

Notwithstanding this report, the Public Health Council at its February 20, 1976 meeting, again deferred action on the application because the available financial information indicated that "the proposed purchase and operation of the hospital and nursing home [was] not financially feasible." The council's specific concern was with how CCF, as a purchaser, would meet its debt obligations each year over the period of the mortgages, considering the limited

reimbursement rates for health care that would be paid by Medicaid. The council felt that even when reduced to $10,350,000 the purchase price greatly exceeded the value that would be recognized for Medicaid reimbursement purposes, approximately $6,000,000; and that while the state, through Medicaid, would reimburse the $6,000,000 to CCF over a period of time, the difference would have to be absorbed by CCF.

Under the statutory and regulatory framework discussed in Part III, *infra*, providers of health-care services are entitled to reimbursement of certain of their costs, including their capital cost, *i. e.* the cost of depreciation and payments on indebtedness incurred in purchasing their facility. The state regulations challenged here provide that after a transfer, the cost of the capital assets to the buyer of a health-care facility (hospital or nursing home) will be the same as the cost of those assets to the seller. This means that the capital cost component of the Medicaid reimbursement rates now paid to the present owners of a facility (here, the plaintiffs) would, after a sale, be the same amount paid to the new owner (here CCF) without any increase for reimbursement of the purchase price. The state regulations thus recognize only the net depreciated value of the facility in computing the capital cost component of the reimbursement rate paid to the new owner, rather than the higher purchase price actually paid by the new owner. If the full purchase price were to be amortized over the years the money would not come from Medicaid reimbursement, but would have to be met by other income or assets of CCF. This the Public Health Council determined CCF would be unable to provide.

By letter dated May 17, 1976, the Department of Health requested that CCF provide written assurances that in the event an operational surplus were not available and a sum in excess of the $125,000 already

---

**5.** In addition, CCF was to assume an existing mortgage, obtain a new mortgage secured by the nursing home's land, building and equipment, and pledge $125,000 annually from an

anticipated operating surplus, to meet any shortfall in paying off debt obligations stemming from the purchase price.

pledged were to become necessary, CCF would pledge its assets to assure continued operation of the medical center, and to meet all debt obligations. When such assurances were not forthcoming, the Department of Health staff reevaluated CCF's financial position and issued a report dated May 19, 1976 recommending disapproval of the application on the ground that there were inadequate sources of future revenue, thereby rendering the transaction not financially feasible.

On June 21, 1976, CCF was notified that the Public Health Council proposed to disapprove its application to purchase and operate the medical center, and CCF promptly requested a hearing pursuant to Public Health Law § 2801–a(2). Even though the present litigation was instituted on December 20, 1976, the state administrative hearing was not held until late in the following year: October 19–21, November 4, 30, December 2, 22, 1977 and January 6, February 16, and March 29, 1978. In a report dated May 27, 1978, the hearing officer recommended that CCF's application be denied because it had failed to demonstrate adequate financial resources and adequate sources of future revenue. The Public Health Council adopted that recommendation.

## III. *STATUTORY AND REGULATORY FRAMEWORK*

The Medicaid program, enacted as Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, provides for federal and state sharing of costs for medical and rehabilitation services provided to certain qualified individuals, specifically those in low income

or indigent categories. This program of medical assistance is administered by the states through various state plans which are subject to the approval of the Secretary of HEW. Under the state plans, providers of health-care services, such as hospitals and nursing homes, are reimbursed for certain costs of the services provided. The New York State Plan for Medical Assistance was approved by the Secretary in 1970.

The Medicaid statute sets forth requirements and guidelines for the content of state plans. It requires, *inter alia*, that for hospital services the state plan shall provide for "payment of the *reasonable cost* * * as determined in accordance with methods and standards * * * which shall be developed by the State and reviewed and approved by the Secretary * * *." 42 U.S.C. § 1396a(a)(13)(D) (emphasis supplied). For nursing facilities, the statute requires a state plan to provide for "payment * * * *on a reasonable cost related basis*, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary." 42 U.S.C. § 1396a(a)(13)(E) (emphasis supplied).

Under the Medicaid statute, the reasonable costs for reimbursement of in-patient hospital services are not to exceed the amount that would be determined under the federal Medicare provisions, 42 U.S.C. § 1396a(a)(13)(D).[6] Although there is no comparable statutory provision with regard to reimbursement rates for skilled nursing services, the same result is required by the federal regulations which similarly provide that Medicaid reimbursement rates for such

---

**6.** The Medicare statute provides that "reasonable cost" is "the cost actually incurred * * * and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services * * *." 42 U.S.C. § 1395x(v)(1)(A). Among the allowable costs used in determining reimbursement rates for in-patient hospital services are those for patient care, drugs, occupational physical, or speech therapy, depreciation on

hospital assets, interest expense, specified educational activities, return on equity capital, etc. See 42 CFR § 402 *et seq.* Allowable costs for skilled nursing services, which are determined on a "reasonable cost-related basis", 42 CFR § 447.273, may, in addition to the foregoing, include expenses for routine services such as room, dietary and nursing services, minor medical and surgical supplies, use of equipment and facilities, medication, oxygen, etc. See 42 CFR § 447.279–284.

services shall not exceed Medicare limitations. See 42 C.F.R. § 447.315(c).[7]

More importantly for purposes of this case, in determining what methods and standards it will apply to ascertain reimbursement rates for both hospitals and nursing homes, the state may either adopt the federal Medicare standards, or adopt different methods and standards, provided they are approved by the regional Medicaid director. 42 CFR §§ 447.261(b)(2), (d) & 447.276(c). Thus, although the Medicare reimbursement methods and standards provide a maximum limit on reimbursement rates, they do not prevent a state from using other methods or standards in fixing its reimbursement rates.

The reimbursement rate paid to health-care providers is made up of a number of factors, one of which is based on capital cost, i. e., what had been paid for the facility. Prior to 1975, the applicable state regulations permitted a provider's capital cost component to include the cost of purchasing the facility. Under those regulations then, CCF's purchase price of $10,350,000 would have been the basis for the capital cost component for reimbursement for Medicaid services. However, on March 10, 1975, the state defendants promulgated amendments to the methods and standards used to calculate Medicaid reimbursement rates; those amendments, which by their terms became effective on October 14, 1975, but which were not approved by the Secretary until August 16, 1976, limit the capital cost component for reimbursement to the net depreciated value of the facility, rather than the purchase price.

In one of their moving affidavits plaintiffs acknowledge that underlying the new regulations, which had been promulgated in response to New York's nursing home scandals, were certain principles:

1. The State should pay for a facility only once.

2. Reimbursement must be reasonably related to the delivery of health care services and not be dependent upon real estate transactions and changes of ownership.

3. Excessive profits must be eliminated, particularly where they are totally unrelated to the improvement of either the quality or quantity of health care services delivered.

4. Similar facilities should receive similar reimbursement without regard to the nature of ownership or subsequent transfers.

5. Delivery of health care is not served by inducing, through the potential of economic gain, frequent transfers of health care facilities.

Aff. of Robert Andrew Wild, ¶ 25.

The regulations were not approved by the Secretary until August 16, 1976, but were given some effect before that time when the Public Health Council indicated several weeks earlier that it was going to deny CCF's application to acquire the medical center. The regulations were codified in 10 NYCRR §§ 86–1 & 86–2 on September 30, 1976.[8]

Plaintiffs contend that disapproval of CCF's application was based on one particular regulation, 10 NYCRR § 86–1.32(b), which is applicable to hospitals and which provides in relevant part:

If a medical facility is sold or leased or is the subject of any other realty transaction after a [reimbursement] rate for the facility has been determined and certified by the commissioner, the capital cost component of such rate shall be considered to be continuing with the same force and effect as though such sale, lease or other realty transaction had not occurred.

A parallel provision, applicable to nursing homes provides:

---

7. Federal regulations governing the procedures and requirements for Medicare payments are at 42 CFR § 405.101 et seq. (1978); federal regulations governing the procedures and requirements for Medicaid payments are at 42 CFR § 447.1 et seq. (1978).

8. These state regulations were originally numbered 10 NYCRR § 86.1 et seq., but effective September 30, 1976, they were renumbered 10 NYCRR § 86–1.1 et seq.

In the event that a residential health care facility is sold or leased or is the subject of any other realty transaction, the capital cost component of such [reimbursement] rate shall be considered to be continuing with the same force and effect as though such sale, lease or other realty transaction has not occurred.

10 NYCRR § 86–2.19(f).

Applied to the subject transaction, these provisions limit CCF's proposed capital cost component to the net depreciated value of the medical center ($6,000,000) rather than allowing the purchase price ($10,350,000), which for purposes of this decision is assumed to be reasonable. The difference would not be included in Medicaid reimbursement, and would have to be absorbed by CCF in some other way. On the basis of this consideration, the Public Health Council determined that CCF's ownership and operation of the medical center would not be financially feasible, and ultimately disapproved the transfer.

Plaintiffs contend that CCF's application must be approved because (1) it was made and denied before the new regulations became effective, (2) the new regulations conflict with the federal Medicare regulations and therefore violate the supremacy clause, and (3) by limiting the capital component in the reimbursement rate to "net depreciated value" the new regulations confiscate plaintiffs' property.

In addition to denying plaintiffs' claims, defendants advance four defenses that we must consider preliminarily.

## IV. *DEFENSES*

### A. *Abstention*

■ At a conference on July 5, 1978, the state defendants raised for the first time the question of the court's abstaining from adjudication of plaintiff's claims, specifically, the constitutionality of the state regulations. Although plaintiffs have thoroughly briefed the issue of abstention, defendants have submitted no written argument on the point.

The Supreme Court has stated that abstention is appropriate " 'in cases presenting a federal constitutional issue which might be mooted or presented in a different posture by a state court determination of pertinent state law.' " *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 814, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). Here, the validity of the challenged state regulations depends upon their compliance with the federal Medicaid statute and the constitution, and would not be affected by any state court determination of pertinent state law. The Court has also held abstention to be proper "where there have been presented difficult questions of state law bearing on policy problems of substantial public import", *id.*, but such is not the case in this lawsuit. Nor is this an instance where "resolution of a federal constitutional issue is controlled by the interpretation of an unclear or complex state statute that is susceptible to a construction which would avoid or modify the necessity of constitutional adjudication * * *." *McRedmond v. Wilson*, 533 F.2d 757, 760 (CA2 1976) (citing *Railroad COmmission v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941)).

The state defendants' reliance at the July 5, 1978 conference on *Juidice v. Vail*, 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), as authority for abstention, is misplaced. That case concerned a federal action brought to challenge the constitutionality of a state contempt provision by parties involved in a pending state court contempt proceeding. The Supreme Court held that since the federal plaintiffs had the opportunity to present their federal claims in the state proceeding, the principles of comity and federalism enunciated in *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), called for abstention by the federal court. *Juidice* can be distinguished, however, since the court's attention has not been directed to any proceeding now pending in the state courts. The questions presented here are simply whether the state regulations, whose meanings are not in dispute, are inconsistent with federal law and/or violate the constitution.

As the Supreme Court has noted, "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule", and the federal court need not " 'exercise its judicial discretion to dismiss a suit merely because a State court could entertain it.' " *Colorado River Water Conservation District v. United States, supra,* 424 U.S. at 813–14, 96 S.Ct. at 1244. Under the circumstances presented here, therefore, abstention is not called for.

### B. Subject Matter Jurisdiction

■■■ The Secretary contends that the court lacks subject matter jurisdiction as to him because his approval of the state regulations challenged here was a discretionary act. But judicial review is not barred simply because the Secretary's approval or disapproval of the state regulations was a matter for his discretion. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Kingsbrook Jewish Medical Center v. Richardson,* 486 F.2d 663 (CA2 1973); *Aquavella v. Richardson,* 437 F.2d 397 (CA2 1971). Although Congress has not expressly provided for judicial review of such a decision, neither did it preclude review of such questions which arise directly under the Medicaid statute. *American Health Care Association, Inc. v. Califano,* 443 F.Supp. 612, 614 n.* (D.D.C.1977); see also *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Under 28 U.S.C. § 1331,[9] then the court has subject matter jurisdiction of this action.

### C. Sovereign Immunity

■■■ The state defendants rely on the defense of sovereign immunity under the eleventh amendment. Although it is clear that the eleventh amendment precludes the imposition of liability for damages which must be paid from public funds in the state treasury, *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1944); *New York State Health Facilities Association v. Carey,* 76 F.R.D. 128, 130 (S.D.N.Y.1977), it is equally clear that the eleventh amendment does not bar a federal court from prospectively directing state officials to bring their conduct into conformity with federal law. *Rothstein v. Wyman,* 467 F.2d 226, 236 (CA2 1972); *Byram River v. Village of Port Chester,* 394 F.Supp. 618, 628 (S.D.N.Y.1975). See *Scheuer v. Rhodes,* 416 U.S. 232, 237, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Edelman v. Jordan, supra.* Here, plaintiffs seek, in part, an order from the court to "terminate a practice which is [alleged] to be in conflict with federal statutory law", *Rothstein v. Wyman, supra,* in that the state regulations allegedly failed to conform to standards contained in the federal Medicaid statute and regulations. Relief of this sort is not the same as a suit for monetary relief against the state itself, *id.,* and thus does not conflict with the eleventh amendment. Compare *Hospital Association of New York State v. Toia,* 577 F.2d 790, 796 (CA2 1978).

### D. Standing to Sue

■■■ The Secretary questions plaintiffs' standing to challenge the propriety of HEW approval of the state regulations and the constitutionality of the regulations, on the ground that the regulations did not change the reimbursement rate payable to plaintiffs. The court is satisfied that the interests plaintiffs seek to protect are "arguably within the zone of interests" affected by the state regulations here. The regulations affect a transaction, such as the one sought to be consummated here, where plaintiffs

---

**9.** See *Chapman v. Houston Welfare Rights Organization,* —— U.S. ——, 99 S.Ct. 1905, 60 L.Ed.2d 508 (1979), where the Supreme Court held that 28 U.S.C. § 1343(3) cannot be used as a basis for federal jurisdiction over a claim that a state welfare regulation is invalid because it conflicts with the Social Security Act. In the instant matter, however, plaintiffs have challenged the constitutionality of the state regulations as a matter of due process, as well as under the Supremacy Clause, so that there is sufficient basis for federal jurisdiction as a federal question, other than under § 1343. Furthermore, although plaintiffs assert jurisdiction under the Administrative Procedure Act, 5 U.S.C. § 702, they have not directly challenged the Secretary of HEW's actions in connection with this suit.

are selling a health-care facility. See *Hospital Association of New York State v. Toia*, 438 F.Supp. 866, 870 (S.D.N.Y.1977). That plaintiffs may effectively be prevented, by operation of state regulations, some of which have been approved by the Secretary, from selling the medical center for what they consider to be a reasonable price, constitutes a potential economic injury sufficient to give them standing to challenge the regulations. See *National Union of Hospital and Health Care Employees v. Carey*, 557 F.2d 278, 280 (CA2 1976). See also *Association of Data Processing Service Org. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins*, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); *Alabama Nursing Home Association v. Califano*, 433 F.Supp. 1325, 1328–29 (M.D. Ala.1977); *Ostrow Pharmacies, Inc. v. Beal*, 394 F.Supp. 22, 23 (E.D.Pa.1975).

## V. *DISCUSSION*

### A. *Premature Implementation of State Regulations*

■ The language of the Medicaid statute indicates that state regulations on the methods and standards of reimbursement for in-patient hospital services must receive HEW approval before they can be implemented, whereas such regulations on reimbursement for skilled nursing services do not. 42 U.S.C. § 1396a(a)(13)(D) & (E) and § 1396a(b); 45 CFR § 201.2 *et seq.* (1978). See also 42 CFR § 447.261(a). This distinction created one of the issues initially raised by plaintiffs in this case: whether the state defendants relied on *properly implemented* state regulations in denying CCF's application to acquire the medical center. Plaintiffs contend, in effect, that the denial of CCF's application to acquire the medical center was improper because it was based upon premature implementation of the state regulations challenged here.

Although the state regulations for hospitals were not approved by the Secretary until August 16, 1976, the Department of Health relied on the then proposed amendments to recommend denial of CCF's application in May 1976, and the Public Health Council notified CCF on June 21, 1976, of its planned disapproval of the latter's application, again relying on the proposed amendments to the state plan.

Under New York law, however, it is the Public Health Council that has the final say on an application such as that presented by CCF, and its final decision denying the application did not come until 1978, after the public hearing was held pursuant to Public Health Law § 2801–a(2), and long after the regulations had become effective. Thus, there is no issue as to whether or not the regulations challenged here were improperly implemented at the time CCF's application was rejected; the new regulations that were in force at the time the Public Health Council made its final decision were the proper ones to be used. The council should not now be compelled to approve an application simply because it was made or even preliminarily processed, before the amended regulations took effect.

### B. *The Supremacy Clause*

Although the medical facility here consists of a hospital and a nursing home, this transaction involves a single entity: the medical center. Throughout the negotiations between plaintiffs and CCF, the facility was treated as a single unit. Although the hospital and nursing home segments were appraised separately, the final appraisal was phrased in terms of a single figure, and the purchase price agreed upon was also a single figure, without allocation to the component parts of the medical center. Even the state defendants at times treated the medical center as a single entity, particularly in Department of Health staff reports which analyzed the financial feasibility of the proposed transaction. *See* Department of Health staff report dated January 15, 1976 at pp. 3–4, 11, Ex. U to Aff. of Milton H. Stapen; Department of Health staff report dated May 19, 1976, Ex. 5 to Aff. of Frank T. Cicero. In both reports, while acknowledging the component parts of the medical center, the facility was treated as a single unit for purposes of financial feasibility including application of the reimbursement standards contained in the state regulations which were applied

not to either one of the facility's component, but "across the board" to the medical center as a single entity, as a result of which the proposed sale of the medical center was disapproved by the Public Health Council. Sections 86–1.32(b) and 86–2.19(f) of the state regulations are thus the provisions upon which decision in this case turns.

Under the federal statutes noted in Part III, *supra*, hospitals providing in-patient services are entitled to reimbursement for their "reasonable costs", while nursing homes providing skilled nursing services are entitled to reimbursement on a "reasonable cost related basis". Plaintiffs assert that 10 NYCRR §§ 86–1.32(b) and § 86–2.19(f) are inconsistent with both the federal statutory provisions and the federal regulations promulgated thereunder because their limitation of capital reimbursement to "net depreciated value" does not allow "reasonable costs", nor is it a "reasonable cost related basis."

Plaintiffs argue that the challenged state regulations impose upon CCF, as a prospective purchaser of a health care facility, arbitrary ceilings on Medicaid reimbursement rates that are unrelated to the purchaser's reasonable costs of acquisition. They state:

> By restricting the capital cost reimbursement of a potential purchaser of a health facility to that afforded to the previous owner of such facility, the previous owner, is, in effect, "locked" into a permanent ownership. Without reimbursement of capital costs based upon the fair and reasonable purchase price, the purchaser would ever (sic) be able to demonstrate the "financial feasibility" required to receive approval * * * for the transaction.
> Plaintiff's Reply Memorandum of Law, at 27–28.

In response, the state defendants assert that the challenged regulations do provide a reasonable basis for determination of the capital cost component to be recognized on the sale of a facility.[10] They argue that to require the state after a sale to recognize an inflated capital cost component in the Medicaid reimbursement rate, based on a sale price reflecting the current fair market value, would permit the facility's operators to realize, at public expense, a capital cost reimbursement position that they could not achieve under their own operation.

Plaintiffs rely on *Catholic Medical Center of Brooklyn and Queens, Inc. v. Rockefeller*, 305 F.Supp. 1256 (E.D.N.Y.1969), *aff'd* 430 F.2d 1297 (CA2 1970), *remanded on other grounds* 397 U.S. 820, 90 S.Ct. 1517, 25 L.Ed.2d 806 (1970), where a New York statute, which temporarily froze the reimbursement rates for the actual reasonable cost of in-patient services provided to Medicaid participants, was found to violate the Supremacy Clause of the Constitution.[11] In declaring the state rate freeze to be void, the court held that the state must provide for payments to hospitals of the *full* actual and current costs of in-patient hospital services furnished to eligible individuals under Medicaid.

Plaintiffs also cite *Wisconsin Hospital Assn. v. Schmidt*, [1976–77 Transfer Binder] Medicare and Medicaid Guide (CCH) ¶ 27,818 (E.D.Wis.1976), where the state was enjoined from freezing the level of all Medicaid cost reimbursement for in-patient hospital services on the ground that the frozen rates did not account for current reasonable cost and were thus in conflict with 42 U.S.C. § 1396a(a)(13)(D) and federal regulations promulgated thereunder. *Id.*, ¶ 27,818 at 9421.

---

**10.** In *American Health Care Assn., Inc. v. Califano*, 443 F.Supp. 612 (D.D.C.1977), the court upheld the validity of regulations limiting the recovery of profit or similar incentives as a cost component in state Medicaid payments to nonproprietary owners of nursing facilities. The federal regulations were held to be reasonable and not in conflict with the Medicaid statute's "cost-related basis" standard of reimbursement for providers of skilled nursing services.

**11.** See also *Alabama Nursing Home Assn. v. Califano*, 433 F.Supp. 1325 (M.D.Ala.1977), where a state ceiling on the amount of Medicaid reimbursement payments to nursing home operators was held to conflict with federal standards. The case is distinguishable though, because it was undisputed that the state ceiling on such payments was not calculated on a reasonable cost related basis.

Both of those cases, however, dealt with state regulations that prevented reimbursement for out-of-pocket expenses, which differ in principle from the unrealized equity involved in the case at bar. Counsel has cited no decision which on the merits has held invalid either New York's regulations or similar regulations from other states. Not to be forgotten is the fact that the Secretary, guided by the federal "reasonable cost" and "reasonable cost related basis" standards has approved the state limitation under review here.

■■■ As part of their supremacy argument plaintiffs point to the federal regulations for Medicare which do permit reimbursement on the basis of purchase price provided the purchaser can demonstrate that the sale was bona fide and at a price not in excess of the fair market value.[12] If the Medicare test were to be applied here, presumably the transfer to CCF would have been approved.[13] However, the federal Medicare regulations do not control; they determine merely the maximum reimbursement rates. As indicated earlier, the state was granted the option of providing alternate standards, and it has done so by severely restricting the capital cost component of the reimbursement rate. Having done so with the approval of the Secretary, there is no conflict with federal statute or regulation and, therefore, no violation of the supremacy clause.

C. *Constitutionality Under Fifth and Fourteenth Amendments*

Plaintiffs contend that the state regulations cause an unconstitutional taking of their property without just compensation, in violation of the fifth and fourteenth amendments. They argue specifically that the regulations effectively prevent the medical center from being sold at its "fair market value"; that since, for Medicaid reimbursement purposes, only its net depreciated value would be recognized, no prospective purchaser would be willing or able to pay more than the "net depreciated value"; and that plaintiffs, therefore, can only sell the facility at an artificially low price far below either its "fair market value" or its replacement value.

To support this argument of unconstitutionality plaintiffs cite *New York State Health Facilities Assn., Inc. v. Carey*, No. 75 C 3246 (S.D.N.Y. April 20, 1976). But the judgment there was not only granted on default, but also was subsequently vacated and set aside on sovereign immunity grounds. 76 F.R.D. 128 (S.D.N.Y.1977).

Plaintiffs rely primarily on *City of Buffalo v. J. W. Clement Co.*, 28 N.Y.2d 241, 321 N.Y.S.2d 345, 269 N.E.2d 895 (1971), where the New York Court of Appeals held that official condemnation notices, rendering plaintiff's property unsaleable and unrentable, did not amount to an unconstitutional *de facto* taking of property. The court reiterated the principles that "the constitutional provision against the taking of property without just compensation may be violated without a physical taking," and that "injuries which in effect deprive individuals of full or unimpaired use of their property may constitute a taking in the unconstitutional sense . . . ." *Id.* at 253, 321

---

12. The applicable Medicare regulation provides:

In establishing the cost basis for a facility purchased as an ongoing operation * * * the price paid by the purchaser shall be the cost basis where the purchaser can demonstrate that the sale was a bona fide sale and the price did not exceed the fair market value of the facility at the time of the sale. The cost basis for depreciable assets shall not exceed the fair market value of those assets at the time of sale. If the purchaser cannot demonstrate that the sale was bona fide, the purchaser's cost basis shall not exceed the

seller's cost basis less accumulated depreciation.

42 CFR § 405.415(g).

13. There is no suggestion that the subject sale was not bona fide; clearly, the price is substantially below replacement cost less depreciation. To the extent that the concept of "fair market value" is a function of the facility's income, "fair market value" loses meaning because it involves a circular calculation: market value would be in part a function of reimbursement rate which under plaintiffs' argument should be determined by market value.

N.Y.S.2d at 355, 261 N.E.2d at 902. The court also stated that:

> [w]henever a *law* deprives the owner of the beneficial use and free enjoyment of his property, or imposes restraints upon such use and enjoyment that materially affect its value, it deprives him of his property within the meaning of the Constitution."

*Id.* (emphasis in original).

The court, however, specifically limited a *de facto* taking of property to situations involving a direct legal restraint on the property or on its use:

> [T]he concept of *de facto* taking has traditionally been limited to situations involving a direct invasion of the condemnee's property or a direct legal restraint on its use . . . , and to hold that there can be a de facto appropriation absent a physical invasion or direct legal restraint would, needless to say, be to do violence to a workable rule of law.

*Id.* 28 N.Y.2d at 253, 321 N.Y.S.2d at 356, 269 N.E.2d at 902.

The court added that it

> is clear that a *de facto* taking requires a physical entry by the condemnor, a physical ouster of the owner, a legal interference with the physical use, possession or enjoyment of the property or a legal interference with the owner's power of disposition of the property.

*Id.* 28 N.Y.2d at 255, 321 N.Y.S.2d at 357, 269 N.E.2d at 903.

See also *Sayre v. City of Cleveland*, 493 F.2d 64, 70 (CA6 1970); *Thomas W. Garland, Inc. v. City of St. Louis*, 450 F.Supp. 239, 241–42 (E.D.Mo.1978); *Evans v. City of Johnstown*, 96 Misc.2d 755; 410 N.Y.S.2d 199, 201 (1978); *Fisher v. City of Syracuse*, 46 A.D.2d 216, 361 N.Y.S.2d 773 (4th Dept. 1974). None of those circumstances is present here.

Plaintiffs further argue that in this case, the state regulations are unconstitutional because they impair "the power of disposition at will of the owner . . . ," *id.*, and are thus an improper "taking" of property, and cite *United States v. General Motors Corp.*, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311 (1945), where the Supreme Court discussed the concept of "taking":

> Governmental action short of acquisition of title or occupancy has been held, if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter, to amount to a taking.

*Id.* at 378, 65 S.Ct. at 359–360.

The Court went on to add though, that the taking clause of the fifth amendment "concerns itself solely with the 'property', i. e., with the owner's relation as such to the physical thing and not with other collateral interests which may be incident to his ownership." *Id.*

Plaintiffs also cite *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), for the proposition that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as taking." *Id.* at 415, 43 S.Ct. at 160. Unlike the circumstances in that case, however, the instant matter is not one where the state's police power imposed a restriction destroying "existing rights of property and contract." *Id.* at 413, 43 S.Ct. at 159. Instead, in an effort to control the inflationary rise of medical costs the state has limited the amount of future reimbursement it will pay for capital expenditures and thereby reduced the center's future income from Medicaid sources. As a result, plaintiffs may lose a potentially profitable sale, but they have not lost any existing right of property or contract.

It has been held that:

> Many kinds of legislative and administrative action affect property values, but, without some diminution in the owner's right of use, do not constitute a taking within the purvue of the Fourteenth Amendment.

*Chacon v. Granata*, 515 F.2d 922, 925 (CA5 1975), *cert. denied*, 423 U.S. 930, 96 S.Ct. 279, 46 L.Ed.2d 258 (1975).

Guided by these standards, it is apparent that plaintiffs have not been deprived of their property without due process of law in violation of the fourteenth amendment. As before, plaintiffs have full right

to use the medical center property. The challenged regulations impose no direct legal restraint upon the property or upon its use. There has been no physical entry by the state, no ouster of the owner, no legal interference with plaintiffs' physical use, possession or enjoyment of the medical center, nor any legal interference with the owner's power of disposition of the property. Citing the economic realities in operating hospitals and nursing homes, plaintiffs argue with undoubted accuracy that no purchaser would be willing to pay for the medical center significantly more than what the state would allow to be amortized through its reimbursement rates, and that by limiting the basis for reimbursement to "net depreciated value", the state regulations impose upon plaintiffs a constantly diminishing potential sale price.

Although plaintiffs' economic analyses and predictions may be true, they do not add up to confiscation. Plaintiffs have received over recent years the "benefits" of having the taxpayers, through the Medicare and Medicaid systems, pay for medical services rendered at the medical center. The "fair market value" of the center is at least in part a function of its past income and potential future income. That income, in turn, is determined in part by the reimbursement rate allowed by the state. Recognizing that unconscionable profits from pyramiding sales were in the past realized in transfers of nursing homes, New York State intervened to prevent such profiteering at taxpayer expense. It imposed the capital reimbursement limitation, first on nursing homes, and then extended it to hospitals. Having accepted the benefits of governmentally assisted medical programs, plaintiffs now find themselves deprived of a substantial potential profit because the government that initially provided the funds now exerts the inevitable control.

■ But loss of a potential profit is not confiscation. Much governmental regulation restricts use and ultimately reduces value from what it would otherwise be in a "free" market. A rezoning of property from one-half to two acre residential re-

duces its value, and deprives its owner of the opportunity to sell for the more concentrated residential use. But under well established precedents such a rezoning does not constitute confiscation unless it deprives the owner of any use of the property to which it is reasonably adapted.

■ Plaintiffs may still operate the medical center. They may sell it for a price which would recognize full reimbursement for their own investment. They might sell it for a substantially higher price to another purchaser who did not intend to rely for income upon reimbursement through taxpayer financed programs. Plaintiffs might even sell the property for some use other than providing health care. The court recognizes that some of these alternatives may be unrealistic; they may also reflect unwise public policies. The function of this court, however, is not to determine the wisdom of government health programs, of the state's regulations promulgated thereunder, or of the actions taken by the Public Health Council. What the public policy shall be in this area is left, for better or worse, to our legislators and administrators. This court's function is to determine whether the state's regulations violate the Constitution of the United States, the federal statutes, or the federal regulations. After due deliberation, the court concludes that they do not.

Accordingly, plaintiffs' motion for summary judgment is denied, and the court, *sua sponte*, directs that summary judgment be entered on behalf of the defendants. Settle judgment on five days notice.

SO ORDERED.