MICHAEL REESE PHYSICIANS AND
SURGEONS, S.C., and Lawrence Ferguson, M.D., Plaintiffs-Appellees,

v.

Arthur F. QUERN, Director of the
Illinois Department of Public Aid,
Defendant-Appellant.

No. 78–2040.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1979.

Decided Sept. 24, 1979.

James C. O'Connell, Sp. Asst. Atty. Gen., Chicago, Ill., for defendant-appellant.

James C. Murray, Jr., Chicago, Ill., for plaintiffs-appellees.

Before PELL and WOOD, Circuit Judges, and HOFFMAN *, Senior District Judge.

WALTER E. HOFFMAN, Senior District Judge.

Michael Reese Physicians and Surgeons, S.C., a medical corporation organized and certified pursuant to Illinois law, and Lawrence Ferguson, M.D., a physician employed by the corporation, sought and obtained a preliminary injunction order against Arthur F. Quern, the director of the Illinois Department of Public Aid (IDPA), enjoining certain practices of the department relating to payments for physician services rendered under the Medicaid Act, 42 U.S.C. §§ 1396, et seq. Specifically, the corporation objected to a change in IDPA regulations which required each physician provider under the Medicaid program to designate one, and only one, street address (i. e. not a corporate lock box) to which all payment vouchers for services to welfare recipients would be mailed. The institution of the new policy meant that payments for services rendered by physicians at the Michael Reese clinic were no longer mailed to the clinic but were instead forwarded to the individual physician-employees, unless a physician listed the clinic as his designated address. The corporation alleged that the new policy constituted a violation of law and due process and had caused irreparable injury to the clinic.

* Senior District Judge Walter E. Hoffman of the Eastern District of Virginia is sitting by designation.

The court below agreed and entered the preliminary injunction. Quern appeals from that order.

Prior to 1972, it was possible for state departments of public aid to reimburse medical providers at any address designated by the provider on the bill for services rendered. Quite frequently, physicians had their payment vouchers sent directly to factoring companies which would pay the provider at a discounted amount of the face value of the bills in exchange for an assignment of the physician's interest in the bills. In this manner, the provider obtained immediate payment for services rendered, albeit at a discounted rate. However, this system of payment was believed to be responsible for inflated and sometimes fraudulent charges for services rendered. Congress wished to eliminate factors, thereby making each provider responsible for billing for services rendered and personally liable for payments received for those services. To that end Congress enacted 42 U.S.C. § 1396a(a), which was subsequently amended to read as follows:

§ 1396a(a). A State plan for medical assistance must—

.        .        .        .        .

(32) provide that no payment under the plan for any care or service provided to an individual shall be made to anyone other than such individual or the person or institution providing such care or service, under an assignment or power of attorney or otherwise; except that—

(A) in the case of any care or service provided by a physician, dentist, or other individual practitioner, such payment may be made (i) to the employer of such physician, dentist or other practitioner if such physician, dentist, or practitioner is required as a condition of his employment to turn over his fee for such care or service to his employer, or (ii) (where the care or service was provided in a hospital, clinic, or other

facility) to the facility in which care of service was provided if there is a contractual arrangement between such physician, dentist, or practitioner and such facility under which such facility submits the bill for such care or service; and [1]

In October, 1977, IDPA commenced the practice and policy of refusing to mail Medicaid payment vouchers to corporate lock boxes, and of requiring physicians to designate one address to which all vouchers would be sent. The rationale for the policy was to maintain stricter supervision over each recipient of Medicaid payments. In the past, corporate lock boxes had been rented by or placed under control of factors. By requiring a street address IDPA was better able to ascertain that payment vouchers were indeed mailed to a practicing physician. Secondly, by requiring each provider to designate one address to which all of his payments were to be sent, each physician could be held personally responsible for determining that he received payment only for services which he had actually rendered.

Michael Reese Corporation was organized in December, 1972, for the express purpose of treating patients who come to Michael Reese Hospital without having previously chosen a physician. Such patients are for the most part indigents and emergency care patients. Prior to the formation of Michael Reese Corporation, Medicaid patients at the hospital received treatment primarily from interns and resident physicians, rather than from experienced staff physicians. It is not disputed that since its inception the corporation has provided medical services of the highest quality for indigents. Over three hundred physicians devote a portion of their time, which could be spent in private practice, to service at the clinic. As a condition of their employment at Michael Reese, the employee-physicians are required to remit to the corporation all fees generated by their services as employees.

1. Upon passage of § 1396a(a)(32) in 1974, factors resorted to the use of powers of attorney to evade the requirements of the provision. Amendments enacted in 1977 added the language which pertains to such powers of attorney, along with a subsection (B), which is not quoted.

Prior to October, 1977, IDPA issued Medicaid payment vouchers relating to services rendered by Michael Reese Corporation in the name of the employee-physicians who rendered the service, and mailed these payment vouchers to the designated address of the corporation. Vouchers relating to Medicaid services performed by the physicians in their private practices were mailed to the physician's private office. Since the institution of the new policy all Medicaid payments for private practice and clinical practice have been forwarded to one address. Michael Reese Corporation and certain of its employee-physicians have alleged that this has caused considerable confusion as to which vouchers resulted from the separate practices. The physicians have also asserted that this is likely to cause problems with their income tax returns.

Over sixty percent of Michael Reese Corporation's patients are Medicaid recipients. The court below found that in 1976, the corporation received over $65,000 in average monthly payments from IDPA, and over $58,000 per month in 1977. During the first four months of 1978, IDPA payments to Michael Reese Corporation dropped to an average of $24,355.50 a month. It was alleged that this drop in income was directly attributable to the new policy, which had allegedly resulted in the misdirection of payment vouchers and required the installation of expensive administrative systems to monitor the misdirected vouchers.

■ It is elementary that the starting point in every case involving the construction of a statute is the language itself. *Southeastern Community College v. Davis*, —— U.S. ——, ——, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). The language of § 1396a(a)(32) is at the core of this action. Michael Reese Corporation contends that it should be recognized as a physician provider, entitled to receive payment in its corporate name for services rendered by employee-physicians at its facility. Alternatively, the corporation argues that subsection (A) of the provision explicitly or implicitly grants physicians the discretion to designate the clinic as the recipient of his Medic-

aid payment vouchers, since he is required as a condition of employment at Michael Reese to turn over his fees to the corporation. IDPA disagrees. As the agency charged with the administration of the Medicaid program in Illinois, IDPA contends that it is required by § 1396a(a)(32) to make payments directly to the physician who provides the service. Subsection (A) acts to relieve IDPA from the mandate of the provision when dealing with medical corporations such as Michael Reese; however, according to the department's reading of the provision, it remains within the discretion of IDPA to remit payment directly to the physician provider. We agree.

We note at the outset that § 1396a(a)(32) is not unambiguous. The pertinent legislative history does little to relieve that ambiguity. Congress was well aware of the role which clinical facilities such as Michael Reese play in furnishing medical attention to Medicaid recipients. Congress was also aware of the role which less reputable "Medical mills" had come to play in contributing to the escalating fraud in the Medicaid program. *See*, H.R.Rep.No. 393(II), 95th Cong., 1st Sess. 44–50, *reprinted in* [1977] U.S.Code Cong. & Admin.News, pp. 3046–3052.

■ In passing the Medicare and Medicaid Antifraud and Abuse Amendments, Congress required state programs to adopt certain procedures to curb abuses. Congress did not prevent state welfare departments from instituting other reforms which would fall within their discretion in administering the Medicaid programs. Medicaid is an experiment in cooperative federalism, *see*, *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 413, 93 S.Ct. 2507, 37 L.Ed.2d 688 (1973), which literally abounds with options, *Doe v. Beal*, 523 F.2d 611, 616 (3rd Cir. 1975), *rev'd* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977). Medicaid is designed to be flexible enough to meet the varying needs of each state which elects to participate in the program. By approving the Illinois Medicaid plan, and by declining thus far to take any action against the modification in the plan,

the Department of Health, Education and Welfare has in effect expressed its view that the plan is in compliance with applicable statutory and regulatory requirements. *Quern v. Mandley*, 436 U.S. 725, 98 S.Ct. 2068, 2076, 56 L.Ed.2d 658 (1978). The interpretation of the agency charged with administration of the statute is entitled to substantial deference. *New York State Department of Social Services v. Dublino, supra*, 413 U.S. at 421, 93 S.Ct. 2507.

■ The court below also found that the policies and practices of the IDPA in question were violative of the Due Process and Equal Protection Clauses of the United States Constitution. We can discern no such violation. In the area of economics and social welfare, a state does not violate the Constitution merely because the classifications made by its laws are imperfect; it is necessary only that the classification have some reasonable basis. *Dandridge, Chairman, Maryland Board of Public Welfare v. Williams*, 397 U.S. 471, 486, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). This court cannot say that the IDPA policies at issue have no reasonable basis in combatting the very real problem of Medicaid fraud and abuse.

■ Finally, we find no violation of the provisions or requirements of Illinois law. Illinois allows physicians to incorporate their practices, and Congress clearly anticipated that Medicaid services would frequently be provided by clinics operating as corporations. It does not follow that a state may not elect to pay physicians as individuals for the services they perform, rather than making payments to the legal entity under which they practice. Indeed, prior to the institution of the present policy, IDPA had always made payment in the name of the physician, rather than to the Michael Reese Corporation. Section 1396a(a)(32) recognizes that in the normal circumstance payments should be made to the individual performing the service. That section goes on to create an exception for employee-physicians. For the reasons stated above, we hold that the exception acts to relieve the state Medicaid program from the requirement of paying the individual physician; it does not require the program to make payment to the employer upon the request of the physician.

In closing, we note that this is basically a matter between the Michael Reese Corporation and its physician-employees. If the corporation can require its physicians to turn over all the fees they generate as employees to the clinic, it can also require them to list the clinic as their designated address with IDPA.[2] If the corporation is not receiving payments from its employees, it is for one of two reasons: either the physicians are unable to administratively keep up with the services for which they are being paid, or they are willfully failing to turn over the payment vouchers. Both explanations reflect the reasons why IDPA instituted the new policy. Physicians were either unaware of the services being billed in their names, leading to inflated and fraudulent charges on the part of third parties, or else the physician-employees are failing to remit payment vouchers to Michael Reese for services performed at the clinic, then the corporation itself is in a much better position to police its employees than is the Illinois Department of Public Aid.

The decision of the court below is reversed with directions to dissolve the injunction.

REVERSED.

PELL, Circuit Judge, dissenting.

The majority opinion unfortunately perpetuates a rigidly anserine bureaucratic ruling to the detriment of an orderly handling of the needs of public health. I therefore respectfully dissent.

No one can seriously quarrel with a governmental desire to eliminate all unnecessary expenditures of public funds on social programs such as that here involved. The

---

2. The record indicates the IDPA had offered to create separate vouchers, even though it would not agree to send them to different addresses.

anti-factoring legislation was designed for that very purpose. Congress, on the other hand, recognized that there are legitimate clinics such as Michael Reese which are rendering services through salaried employees and expressly permitted the payment to be made to the corporate employer. Congress has thereby declared the policy that payments made directly to the employer are not violative of the anti-factoring precepts but are indeed payments to the party entitled thereto not to someone who has no legal claim.

The state here in an attempt to justify its wooden and unbending insistence on making payments to individuals known to the state not to be entitled thereto ultimately basically resorts to a Pandora's box argument that Medicaid mills "and even factors will attempt to utilize this to their full advantage." The case before us, however, involves a bona fide employer, the very kind contemplated in the Congressional exception to the requirement of direct payment to the individual; no one argues otherwise. The state has to do no more to fasten tight the lid of the famed troublous box than to require adequate documentary proof of the bona fide employer status. The majority opinion suggests that Michael Reese can require the physicians to list the clinic as their address. Elsewhere in the majority opinion there is reference to the state regulation requiring the physician "to designate one, and only one, street address." Inasmuch as many of the physicians are also in private practice, I do not understand that the physicians can furnish more than one street address dependent upon whether they are in the private sector or the employment capacity as to a particular billing.

The state on this appeal emphasizes that the word "may" is permissive and argues therefore that the payment is discretionary and then leaps to the farther point that the exercise of that discretion is lodged with the state administrator. The majority opinion while not apparently relying expressly on the always arguable equation of "may" with permissiveness, nevertheless also concludes that the discretion is solely that of the state. Insofar as the significance of the word "may" is concerned, one need only riffle through the appropriate volume of Words and Phrases to be aware of the substantial attempts of judicial opinions to try to determine whether "may" means "shall" or merely something in the nature of "optional." The cases, in the matter of the statutes, generally end up by referring to the intent of the legislature. Here, the guidance from legislative history does not seem to tell us much except Congress was concerned about excessive claims resulting from factoring. That concern was expressly delimited so as to exclude employers.

In any event, I agree with the majority that on the matter of legislative intent resort should be first had to the words of the enactment themselves. Here the basic statute, pre-exceptions, requires that the plan "must provide" that no payment shall be made to anyone other than the provider of the service. The exceptions clauses do not state that nevertheless the plan may provide for the payment to be made to the employer of the provider of service; instead the exceptions deal with the actual payment notwithstanding the mandatory language required for the plan. This could not very well have been worded in terms that in the event of employment the payment "shall" be made to the employer. Conceivably some employers might prefer that the physician directly do the billing with the amounts received to be credited against his salary obligation. In other words, the "may" in the statute just as logically, because it deals with the payment not the provisions of the plan, can be construed to refer to a discretion on the part of the employer to determine whether it or its employees directly shall bill for and receive payments.

The state by its unbending resistance to the orderly procedure whereby one source, instead of multiple providers, submits billings has demonstrably been detrimental to a valued public health service in this area. This is understandable when it is recalled that the physicians also frequently render services in their private practice for which payments are made. I do not deem it nec-

essary as did Judge Perry to reach the constitutional issue, although I regard the situation as it has developed as involving serious constitutional questions. In my opinion, the state has no choice in the case of a bona fide employer except to pay that employer, if the employer so desires, for the services rendered by its employees. Even, however, if the discretion were considered to rest only with the state rather than the employer, on the facts of the present case, there seems to me to be such a patent abuse of discretion that the injunction granted below should be affirmed.