ILLINOIS COUNCIL FOR LONG TERM CARE, Leon Shlofrock, President; Clayton Residential Home, Inc., an Illinois Corporation, Suburban Terrace # 1, a limited partnership; Melvin Siegel and Sheldon Heidich, general partners; Suburban Terrace # 2, a limited partnership, Melvin Siegel and Sheldon Neidich, general partners; Dolton Terrace, a limited partnership, Melvin Siegel and Sheldon Neidich, general partners; Touhy Terrace Nursing Center, a limited partnership, Martin J. Weiss, general partner; Senn Park Nursing Center, a limited partnership, Martin J. Weiss, general partner; Burnham Terrace Care Center, a limited partnership, Martin J. Weiss, general partner; Northeast Health Care Center, a limited partnership, Martin J. Weiss, general partner; and all others similarly situated, Plaintiffs,

v.

Jeffrey C. MILLER, Director, Illinois Department of Public Aid, and William L. Kempiners, Director, Illinois Department of Public Health, Defendants.

No. 79 C 0262.

United States District Court, N. D. Illinois, E. D.

Dec. 9, 1980.

Edward M. Burke, George Keane, Jr., Klafter, Burke, Keane & Nathan, Chicago, Ill., for plaintiffs.

James C. O'Connell, William A. Wenzel, David A. Schlanger, Sp. Asst. Attys. Gen., Chicago, Ill., for defendants.

# MEMORANDUM OPINION AND ORDER

ASPEN, District Judge:

This is an action for declaratory and injunctive relief and for reimbursement of capital costs on a reasonable cost-related basis under Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, commonly known as Medicaid.[1] Plaintiffs, private nursing homes located in the Chicago area,[2] challenge the system of provider reimbursement for capital costs under the Illinois Medicaid plan as violative of the supremacy clause of the Constitution of the United States, art. VI, cl. 2, in that the Illinois plan is alleged to be inconsistent with the reasonable cost-related reimbursement scheme envisioned by 42 U.S.C. § 1396a(a)(13)(E) and certain federal regulations promulgated thereunder by the United States Department of Health and Human Services (HHS), formerly the Department of Health, Education and Welfare (HEW). Plaintiffs also allege that the Illinois plan violates the due process and equal protection clauses of the fourteenth amendment and that it does not comport with the guidelines set forth by the Illinois Legislature in Ill.Rev.Stat. ch. 23, §§ 5–5.1 *et seq.*[3] Defendants are Mr. Jeffrey C. Miller, Director of the Illinois Department of Public Aid (IDPA), the state agency responsible for the administration of the Illinois Medicaid program, and Mr. William L. Kempiners, Director of the Illinois Department of Public Health. (IDPH)[4] Jurisdiction is grounded in 28 U.S.C. § 1331(a) and 28 U.S.C. §§ 2201–02.

Presently before the Court are the parties' cross motions for summary judgment. The questions to be decided are: (1) whether the Illinois system for reimbursing capital costs is reasonably cost-related as mandated by 42 U.S.C. § 1396a(a)(13)(E); and (2) whether the Illinois plan is so arbitrary or unreasonable as to violate the due process or equal protection clauses of the fourteenth amendment.

## BACKGROUND

The Medicaid Program embodied in Title XIX of the Social Security Act, 42 U.S.C.

1. To the extent that the plaintiffs seek retrospective reimbursement for capital costs incurred after July 1, 1976, it would appear that such relief is barred by the eleventh amendment as interpreted by the Supreme Court in *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890) and its progeny. *Edelman v. Jordan*, 415 U.S. 651, 658, 94 S.Ct. 1347, 1353, 39 L.Ed.2d 662 (1974); *Parden v. Terminal Railway*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964). Because of this Court's disposition of the merits of this case, however, it is unnecessary to consider the request for monetary relief in any detail.

2. This lawsuit was originally filed in the Circuit Court of Cook County. Defendants removed the action to this Court pursuant to 28 U.S.C. § 1441(b) and this Court denied plaintiffs' motion to remand on April 30, 1979. Several of the original plaintiffs were voluntarily dismissed prior to the filing of the motions for summary judgment at issue herein. The remaining plaintiffs are: Suburban Terrace No. 1, Suburban Terrace No. 2, Dolton Terrace, Melvin Siegel, Sheldon Neidich, Senn Park Nursing Center, Burnham Terrace Care Center, Northeast Health Care Center, and Martin J. Weiss.

3. Although plaintiffs contend that certain aspects of the Medicaid plan adopted by the Illinois Department of Public Aid (IDPA) violate provisions of the Illinois Public Aid Code concerning capital cost reimbursement, *Ill.Rev. Stat.* ch. 23, §§ 5–5.1–5–5.7 (1979), those statutory provisions speak permissively and not mandatorily with respect to a formula for taking capital costs into account in conjunction with reimbursement of long-term nursing care facilities. The only mandate contained in the Illinois statute is that "[a]ll reimbursement rates established pursuant to [the Public Aid Code] must be consistent with the criteria for nursing facility reimbursement established by the federal government for approval of matching funds under Title XIX of the Federal Social Security Act." *Ill.Rev.Stat.* ch. 23, § 5–5.6 (1979). Accordingly, resolution of the federal questions presented herein will dispose of the state law claim.

4. Although Mr. Kempiners is named as a defendant in this case, plaintiffs indicate in their memoranda filed in conjunction with their motion for summary judgment that they seek no relief from him and they do not oppose the grant of summary judgment in his favor dismissing him from the case. Since Mr. Kempiners has no responsibility for administering the provider reimbursement aspects of the Illinois Medicaid program, his motion for summary judgment is granted. *See Country Manor Nursing Home, Inc. v. Kempiners*, No. 80–2492 (N.D.Ill., Sept. 8, 1980) (Shadur, J.).

§ 1396 *et seq.*, provides for a partnership between federal and state government designed to share the cost of medical services to needy individuals with limited incomes and resources. Under Title XIX, a state must designate "a single state agency to administer or to supervise the administration of the [state Medicaid] plan." 42 U.S.C. § 1396a(a)(5). That state agency then draws up a medical assistance plan consistent with the guidelines contained in Title XIX and the regulations promulgated thereunder and submits it to the Department of Health and Human Services (HHS) for approval. Upon approval of the plan by HHS, the state becomes eligible for federal matching funds for reimbursement of the cost of specific types of medical assistance. 42 U.S.C. § 1396b(a).

In 1972, Congress amended the existing Medicaid legislation to provide for reimbursement of skilled and intermediate nursing care facilities on a "reasonable cost related basis" for services rendered to Medicaid recipients. Public Law 92–603, § 249; 42 U.S.C. § 1396a(a)(13)(E).[5] The 1972 amendment "was apparently a result of Congressional displeasure with widespread state endorsement of flat rate payment systems which were perceived as failing to bring about quality care and the efficient, economical provision of such service." *American Health Care Association v. Califano*, 443 F.Supp. 612, 614 (D.D.C.1977). By providing for payment on a "reasonable cost related basis" in 42 U.S.C. § 1396a(a)(13)(E) rather than payment of the "reasonable cost" of services as provided in 42 U.S.C. § 1396a(a)(13)(D) Congress intended to give states greater flexibility in formulating reimbursement methods that would assure quality care for low income nursing home residents while also controlling the spiraling costs of Medicaid. *Hempstead General Hospital v. Whalen*, 474

F.Supp. 398, 403, 408–9 (E.D.N.Y.1979), *affirmed*, 622 F.2d 573 (2d Cir. 1980); *American Health Care, supra*, 443 F.Supp. at 614. HHS belatedly promulgated regulations implementing the 1972 amendment on July 1, 1976 [41 Fed.Reg. 27300–27308 (1976)], and published a supplementary statement of basis and purpose on February 6, 1978 [43 Fed.Reg. 4861–4864 (1978)], pursuant to the court's order in *American Health Care, supra.*

An amendment to the Illinois Medicaid plan concerning reasonable cost related reimbursement for skilled nursing and intermediate care facilities was approved by HHS on March 30, 1978, with an effective date of January 1, 1978. The aspect of the amended plan here in issue is the method of reimbursement for capital costs incurred by the facility. Under the Illinois plan, nursing facilities are placed into one of twenty-five groups based upon the facility's age and location. Age is determined by the year of construction or acquisition, whichever is later, prior to July 1, 1977. A facility acquired after that date is placed in a group on the basis of its most recent date of construction or acquisition prior to July 1, 1977. Once placed in a group, the facility remains in that group. Each facility is reimbursed for its capital costs on the basis of a weighted average of the age of the facilities and size of the investments of all the facilities in the group. Facilities below the median receive the median. Facilities above the median receive the median plus 80% of their allowable costs above the median up to 110% of the median.

Each year the median capital cost of facilities in each group is recalculated to reflect the most recent report of allowable costs, including costs of acquisition in arms-length transactions subsequent to July 1, 1977. If a facility's new allowable cost increases to above the median, it is eligible

---

**5.** 42 U.S.C. § 1396a(a)(13)(E) provides in full as follows:

(a) A State plan for medical assistance must

. . .

(13) provide . . .

(E) effective July 1, 1976, for payment of the skilled nursing facility and intermediate

care facility services provided under the plan on a reasonable cost related basis, as determined in accordance with methods and standards which shall be developed by the State on the basis of cost-finding methods approved and verified by the Secretary.

for the additional reimbursement. If the transaction involving the facility has led to the calculation of higher median costs for the group as a whole, that will also be reflected in its reimbursement. "Thus, the state expects the group median will increase over time and in some very rough way approximate what people are, on the average, willing to pay for nursing homes built in that particular time period." Defendants' Answers to Plaintiffs' First Set of Interrogatories at 8.

Plaintiffs contend that the Illinois method of reimbursement for capital costs is not reasonably cost related as mandated by Congress in 42 U.S.C. § 1396a(a)(13)(E) and HHS in 42 C.F.R. § 447.301–306 since it "eliminates from any consideration the actual cost of acquisition of all post-July 1, 1977 acquisitions." Plaintiffs' Memorandum in Support of Summary Judgment at 4. They maintain that the July 1, 1977, cut-off date for consideration of capital costs in making the initial groupings of nursing facilities operates as an impermissible ceiling on consideration of actual out-of-pocket costs, thus making it more difficult for facilities to operate successfully and burdening facilities sold after July 1, 1977, by placing them in an "older" group with a presumably lower median. Plaintiffs also contend that the amended Illinois plan, which was approved by HHS on March 30, 1978, with an effective date of January 1, 1978, but which imposes a July 1, 1977, cut-off for consideration of capital costs, has a retroactive effect that violates the due process and equal protection clauses of the fourteenth amendment in its impact on

facilities acquired after July 1, 1977, but before the January 1, 1978, effective date. Plaintiffs further attack the July 1, 1977 cut-off as arbitrary, capricious, and unreasonable, presumably in violation of due process and equal protection principles.

## I.

As a preliminary matter, we note that HHS's approval of the Illinois Medicaid plan, as amended, on March 30, 1978, is entitled to substantial deference in this Court. *See Quern v. Mandley,* 436 U.S. 725, 743–44 n.19, 98 S.Ct. 2068, 2078–79, 56 L.Ed.2d 658 (1978); *New York Department of Social Services v. Dublino,* 413 U.S. 405, 421, 93 S.Ct. 2507, 2516, 37 L.Ed.2d 688 (1973). As the United States Court of Appeals for the Seventh Circuit said in *Michael Reese Physicians & Surgeons, S.C. v. Quern,* 606 F.2d 732, 735–36 (7th Cir. 1979), *panel opinion adopted en banc,* 625 F.2d 764 (7th Cir. 1980):

> By approving the Illinois Medicaid plan and by declining thus far to take any action against the modification in the plan, the Department of Health, Education and Welfare [now the Department of Health and Human Services] has in effect expressed its view that the plan is in compliance with applicable statutory and regulatory requirements.... The interpretation of the agency charged with administration of the statute is entitled to substantial deference.

(citations omitted).[6]  *See also Unicare Health Facilities, Inc. v. Miller,* 481 F.Supp.

---

**6.** The parties have engaged in an extensive debate in their briefs regarding the relative burdens of proof in this case and the weight and effect of any presumptions to be accorded the Illinois Medicaid plan. Plaintiffs have argued that the Illinois Medicaid plan is closely analogous to an interpretive rule which is entitled to no particular presumption of validity. *Cf. Daughters of Miriam Center for the Aged v. Mathews,* 590 F.2d 1250 (3d Cir. 1978). *See also Cerro Metal Products v. Marshall,* 620 F.2d 964, 981 (3d Cir. 1980). However, the change in the reimbursement formula under the Illinois Medicaid plan is clearly different from the change in the Medicare regulations themselves contained in the provider reimbursement manual which was at issue in *Daughters of Miriam.* Defendant Miller argues persuasively that the Illinois plan is not a "rule," interpretive or otherwise, but is rather a contract between the state and federal government that is without legal effect until it is approved by HHS. As far as this Court is aware, the only court to squarely address the relationship between a required state plan and the definition of a "rule" under the Model State Administrative Procedure Act, *Ill.Rev.Stat.,* ch. 127, § 1001 *et seq.* (1979), is the District of Columbia Court of Appeals in *Wolston v. District of Columbia Department of Human Resources Social Services Administration,* 291 A.2d 85 (D.C.1972). In that case, the court held that the local agency's "plan of oper-

496, 498 (N.D.Ill.1979); *Hempstead General Hospital v. Whalen*, 474 F.Supp. 398, 409 (E.D.N.Y.1979), *affirmed*, 622 F.2d 573 (2d Cir. 1980). With these principles in mind, this Court will first consider the plaintiffs' challenge to the Illinois plan as inconsistent with 42 U.S.C. § 1396a(a)(13)(E) and the regulations promulgated thereunder by HHS followed by a discussion of plaintiffs' due process and equal protection challenges to the Illinois plan.

In amending Title XIX in 1972, Congress intended to give the states maximum flexibility to develop creative methodologies for reimbursement of skilled and intermediate nursing facilities on a reasonable cost related basis. 42 U.S.C. § 1396a(a)(13)(E). *See generally* S.Rep.No.92–1230, 92d Cong.2d Sess. 287 (1972); 43 Fed.Reg. 4861–4864 (1978); 41 Fed.Reg. 27300–27308 (1976). "The legislative history indicates that states are to be free to experiment with methods and standards for payment that would be simpler and less expensive than the complex Medicare reasonable cost formula." *Alabama Nursing Home Association v. Harris*, 617 F.2d 388, 392 (5th Cir. 1980). As the Seventh Circuit reflected in *Michael Reese Physicians & Surgeons, S.C., supra*, "Medicaid is an experiment in cooperative federalism ... which literally abounds with options." 606 F.2d at 735 (citations omitted). Of course, the states may not be arbitrary or capricious in their rate setting, but it is clear that Congress intended to sacrifice some of the precision in cost reimbursement embodied in the Medicare "reasonable cost" formula for the flexibilities of state developed programs in accordance with the "reasonable cost related" formula embodied in 42 U.S.C. § 1396a(a)(13)(E). *Unicare Health Facilities, Inc. v. Miller*, 481 F.Supp. 496, 498 (N.D.Ill.1979); *Hempstead General Hospital v. Whalen*, 474 F.Supp. 398, 408 (E.D.N.Y.1979); *American Health Care Association, Inc. v. Califano*, 443 F.Supp. 612, 614–15 (D.D.C.1977).

It is settled that 42 U.S.C. § 1396a(a)(13)(E) does not impose a requirement that states reimburse a Medicaid provider for every allowable cost it incurs. *Minnesota Association of Health Care Facilities, Inc. v. Minnesota Department of Public Welfare*, 602 F.2d 150, 153 (8th Cir. 1979); *Unicare Health Facilities, Inc. v. Miller*, 481 F.Supp. 496, 499 (N.D.Ill.1979). Although plaintiffs attempt to distinguish *Minnesota Association of Health Care Facilities* and *Unicare Health Facilities* on the ground that both dealt with the issuance of preliminary injunctions, the discussion of congressional intent in those cases is equally applicable to the case at bar. Furthermore, HHS has explicitly rejected the contention that Section 1396a(a)(13)(E) embodies "[a] rigid requirement that a state pay to each facility the full amount of its allowable costs." 41 Fed.Reg. at 27303. Rather, HHS indicated that "the States are to be free in setting their reasonable cost related payment rate to take into account, on the one hand, incentives towards efficiency and economy and, on the other hand, incentives to upgrade the quality of care and to provide for growth and improvements." *Id.* Other courts have also rejected challenges to Medicaid plans based upon the argument that providers must be reimbursed for all their allowable costs.

In *American Health Care Association, Inc. v. Califano*, 443 F.Supp. 612 (D.D.C. 1977), the court upheld regulations that completely disallowed profit as an item to be considered in the determination of reimbursable costs under 42 U.S.C. § 1396a(a)(13)(E). Contrary to plaintiff's contention that *American Health Care* stands for the proposition that a limitation which puts a ceiling on consideration of costs is improper, the court expressly stated that it was "unpersuaded by plaintiffs' protestations that a reimbursement ceiling contradicts congressional desires to provide

---

ation," which was similar in kind to the Illinois state Medicaid plan in that it was only effective after approval by the federal government, was not a rule for purposes of the APA. In any event, this Court is of the opinion that the

Illinois plan, as approved by HHS, is entitled to substantial deference for the reasons noted by the court in *Michael Reese Physicians & Surgeons, S.C. v. Quern*, 606 F.2d 732 (7th Cir. 1979).

states maximum flexibility in establishing reimbursement schemes." *American Health Care, supra,* 443 F.Supp. at 615.[7] Furthermore, in *Hempstead General Hospital v. Whalen,* 474 F.Supp. 398 (E.D.N.Y. 1979), *affirmed,* 622 F.2d 573 (2d Cir. 1980), the court rejected a challenge to the New York Medicaid plan for reimbursement of capital costs which was much less flexible than the aspects of the Illinois plan at issue in the instant case. The New York plan provided that only the original cost of construction or acquisition would be considered in determining the reimbursement rate for capital costs. The increased capital costs resulting from subsequent transfers of the facility were not considered at all as "[t]he state regulations ... provide that after a transfer, the cost of the capital assets to the buyer of a health care facility ... will be the same as the cost of those assets to the seller." *Hempstead General Hospital, supra,* 474 F.Supp. at 402. The court held that such a reimbursement scheme, which had been approved by HEW (now HHS), was consistent with the reasonable cost related basis reimbursement required by 42 U.S.C. § 1396a(a)(13)(E).

To the extent that *Hempstead General Hospital* is distinguishable from the case at bar, the differences harm rather than aid plaintiffs' contentions herein. The New York plan completely restricted nursing homes to their original costs regardless of any subsequent transfers, which would usually be at a higher price. The Illinois plan, by contrast, considers the most recent purchase price prior to July 1, 1977, in making its initial grouping for purposes of reimbursement of capital costs. Thus, the initial reimbursement rate in Illinois would tend to be higher than that in New York. In addition, the Illinois plan takes account of transfers after July 1, 1977, by recalculating the median reimbursement rate for each group of nursing facilities. The New York plan, on the other hand, treats subsequent purchases and sales of a nursing facility as if they never occurred for purposes of computing the reimbursement rate for capital costs.

Other cases cited by the plaintiffs in support of their position that the Illinois Medicaid plan imposes an impermissible ceiling on the consideration of capital costs are equally unavailing. In *Alabama Nursing Home Association v. Califano,* 433 F.Supp. 1325 (M.D.Ala.1977), the court twice stated that it was undisputed that the ceiling on reimbursement involved in that case was not reasonable cost related. 433 F.Supp. at 1328, 1330. Instead, the State of Alabama had adopted a per diem ceiling on Medicaid reimbursements to skilled and intermediate nursing care facilities because the legislature had failed to appropriate sufficient funds to meet the State's Medicaid budgetary needs. The court noted that the State Board of Health had rejected a more palatable alternative which would have pegged reimbursement at the mean of rates plus a one-half standard deviation. 433 F.Supp. at 1328. In the instant case, however, the State affirmatively disputes the plaintiffs' contention that the reimbursement rates are not cost related. Another case cited by the plaintiffs, *Catholic Medical Center of Brooklyn and Queens, Inc. v. Rockefeller,* 305 F.Supp. 1256, 1268 (E.D.N.Y.1969), *vacated and remanded for entry of an appealable order,* 397 U.S. 820, 90 S.Ct. 1517, 25 L.Ed.2d 806 (1970), *affirmed,* 430 F.2d 1297 (2d Cir.), *appeal dismissed,* 400 U.S. 931, 91 S.Ct. 246, 27 L.Ed.2d 262 (1970), similarly stands for the proposition that inadequate funding does not excuse a state's failure to comply with federal guidelines. In an *amicus curiae* brief submitted at the court's request in *Catholic Medical Center,* "HEW plainly states that the absence of retroactive adjustment for reasonable cost of inpatient hospital services under the New York statute is inconsistent with federal regula-

---

7. The court noted that "[t]he Secretary persuasively argues that profit is not an item of cost in the traditional accounting sense and that a 'reasonable cost related rate' by its terms precludes a reimbursement scheme which includes profit." *American Health Care Association, Inc. v. Califano,* 443 F.Supp. 612, 615 n.4 (D.D.C.1977).

tions issued under the Social Security Act." 305 F.Supp. at 1269.[8]

Far from being motivated solely by budgetary constraints, the Illinois limitation on consideration and reimbursement of capital costs is grounded in sound policy considerations. IDPA contends that it adopted a date beyond which it would take a substantially different view of capital costs in order to prevent "trafficking" or "pyramiding" in nursing homes, a practice that apparently had become quite widespread in the industry.[9] Studies of the nursing home industry had revealed that there was a substantial secondary market in nursing homes whereby nursing home operators would sell their facilities to each other at prices well in excess of construction costs in order to obtain increased reimbursement for capital costs.[10] Basing reimbursement on such increased sales "costs" does nothing to upgrade the quality of care available to the low income residents of the facility who are to be the ultimate beneficiaries of Medicaid. Rather, in such circumstances, reimbursement of actual capital costs creates an incentive to engage in sham transactions in which the buyer, assured of full capital cost reimbursement from the state, is willing to pay an inflated price for the nursing facility with no corresponding commitment to upgrade the standard of care provided by the facility. The cut-off date of July 1, 1977, was selected by IDPA as the date after which capital costs would be handled differently because of the agency's perception that ordinary market pressures no longer existed as of that time. Defendants' An-

swers to Plaintiffs' First Set of Interrogatories at 4.

■ Accordingly, this Court finds that the Illinois plan for reimbursement of Medicaid providers' capital costs represents a reasonable accommodation of the competing interests Congress sought to balance in providing for reimbursement of skilled and intermediate nursing care facilities on a reasonable cost related basis in 42 U.S.C. § 1396a(a)(13)(E). The plan "take[s] into account, on the one hand, incentives towards efficiency and economy and, on the other hand, incentives to upgrade the quality of care and to provide for growth and improvements." 41 Fed.Reg. at 27303. In so doing, the plan does not conflict with 42 U.S.C. § 1396a(a)(13)(E) and, therefore, does not violate the supremacy clause.

### II.

■ Plaintiffs also contend that the amended state plan, approved by HHS on March 30, 1978, with an effective date of January 1, 1978, violates the due process and equal protection clauses of the fourteenth amendment because of the asserted retroactive application of the July 1, 1977, "cut-off" for consideration of capital costs to facilities acquired after that date but before the date of the plan. It is well established that in the area of economic regulation, "the burden is on the one complaining of a due process violation to establish that the legislature [or the Secretary] has acted in an arbitrary and irrational

---

**8.** It should be noted that *Catholic Medical Center* involved the reasonable cost standard under 42 U.S.C. § 1396a(a)(13)(D) rather than the more flexible reasonable cost related reimbursement under 42 U.S.C. § 1396a(a)(13)(E), since that case was decided well before the 1972 Medicaid amendments were passed by Congress.

**9.** As the court said in *American Health Care Association, Inc. v. Califano*, 443 F.Supp. 612, 614 (D.D.C.1977), "[t]he Court is not oblivious of the widespread complaints, reported in the public press, of the burgeoning costs of Medicaid resulting from lack of proper cost criteria."

**10.** IDPA relied on several of these studies in designing the reimbursement methodology at

issue in this case: Schulman and Galanter, *Reorganizing the Nursing Home Industry, A Proposal*, Health and Society, Spring, 1976; M. Mendolson, *Tender Loving Greed, How the Incredibly Lucrative Nursing Home "Industry" is Exploiting America's Old People and Defrauding Us All* (New York: Alfred A. Knopf, 1974); *New York Moreland Act Commission on Nursing Homes and Residential Facilities, Reimbursement of Nursing Home Property Costs: Pruning the Money Tree* (State of New York: January 1976). Defendants' Answers to Plaintiffs' First Set of Interrogatories at 5. *See also* Vladeck, *Unloving Care, The Nursing Home Tragedy* (New York: Basic Books, 1980).

way." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15, 96 S.Ct. 2882, 2892, 49 L.Ed.2d 752 (1976); *Springdale Convalescent Center v. Mathews*, 545 F.2d 943, 955 (5th Cir. 1977). In passing upon the validity of a retroactive ruling, courts have generally balanced the public interests advanced by the ruling with the private interests overturned by it. *See Summit Nursing Home, Inc. v. United States*, 572 F.2d 737, 743 (Ct.Cl.1978); *Adams Nursing Home of Williamstown, Inc. v. Mathews*, 548 F.2d 1077, 1080 (1st Cir. 1977). If the balance that is struck is found to be reasonable, the rule will be upheld. *Usery v. Turner Elkhorn Mining Co., supra*, 428 U.S. at 18–19, 96 S.Ct. at 2893–2894; *Summit Nursing Home, Inc., supra*, 572 F.2d at 743. Applying this test to the case at bar, it is clear that the Illinois Medicaid plan, as amended, does not disturb settled constitutional rights.

Plaintiffs concede that the State has a legitimate interest in preventing reimbursement for inflated capital costs that result from "trafficking" in nursing homes. Moreover, the Supreme Court has recognized that in the due process analysis, "the Government's interest, and hence that of the public, in conserving scarce fiscal and administrative resources is a factor that must be weighed." *Mathews v. Eldridge*, 424 U.S. 319, 347, 96 S.Ct. 893, 908, 47 L.Ed.2d 18 (1976). *Cf. Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970). The State also has an important interest in ensuring that low income residents of nursing homes receive quality care. *See Green v. Cashman*, 605 F.2d 945, 946 (6th Cir. 1976).[11] Balanced against the State's interests is plaintiffs' primary interest in receiving reimbursement on a reasonable cost related basis as mandated by Congress in 42 U.S.C. § 1396a(a)(13)(E). Plaintiffs appear to sug-

gest that they had some sort of a vested interest or at least a justified expectation in continuing to be reimbursed for their capital costs under the same methodology in use before the Illinois plan was amended. As demonstrated in Part I of this opinion, *supra*, however, the Illinois plan as amended is consistent with federal guidelines. Moreover, other courts have noted that any change in the law, "whether prospective or retroactive in application, often [has] economic consequences which may be inconsistent with a party's reasonable expectations . . . [but] [s]uch inconsistencies are not equivalent to unconstitutionality." *Springdale Convalescent Center v. Mathews*, 545 F.2d 943, 955 (5th Cir. 1977). As the court said in *South Terminal Corp. v. Environmental Protection Agency*, 504 F.2d 646, 678 (1st Cir. 1974), "all changes in the law dash expectations when they make tomorrow's rules different from yesterday's; [but] it is not even clear that a law having an effect which may be termed 'retroactive' is necessarily unconstitutional." Similarly, in *Usery v. Turner Elkhorn Mining Co., supra*, the Supreme Court expressly stated that "our cases are clear that legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations." 428 U.S. at 16, 96 S.Ct. at 2892.

The retroactive impact of the July 1, 1977, cut-off for consideration of actual capital costs is not so "harsh or oppressive" as to violate traditional principles of due process, *see, e. g., United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17 n.13, 97 S.Ct. 1505, 1515, 52 L.Ed.2d 92 (1977); *Welch v. Henry*, 305 U.S. 134, 147, 59 S.Ct. 121, 125, 83 L.Ed. 87 (1938), especially in light of the fact that the Illinois plan does consider capital costs incurred after July 1, 1977, in recalculating the median reimbursement levels each year. Plain-

---

11. In the course of its discussion of whether a nursing home is entitled to a due process hearing prior to its termination from the Medicaid program for noncompliance with certain regulatory standards, the court noted:

   We do not find in the statute authorizing Medicare or Medicaid any legislative inten-

tion to provide financial assistance to providers of care for their own benefit. Rather, the statute is designed to aid the patients and clients of such facilities.
   *Green v. Cashman*, 605 F.2d 945, 946 (6th Cir. 1976).

tiffs suggest that the State can accomplish its legitimate interests in a more rational and less burdensome manner by concentrating its efforts on ferreting out inflated costs as they are reported on a facility-by-facility basis. However, whether another method "would have been wiser or more practical under the circumstances is not a question of constitutional dimension." *Usery v. Turner Elkhorn Mining Co., supra*, 428 U.S. at 19 (citations omitted). *Accord: Unicare Health Facilities, Inc. v. Miller*, 481 F.Supp. 496, 498 (N.D.Ill.1979).

The nature of plaintiffs' equal protection challenge to the July 1, 1977 cut-off date is unclear from the memoranda filed in support of their motion for summary judgment. Their argument appears to be that the State has not shown any equitable basis upon which to distinguish between transfers of nursing facilities before and after the July 1, 1977, deadline. Even if this Court agreed that the State's asserted basis for selecting the July 1, 1977, date is "unscientific" or represents a "rough accommodation" between competing interests,[12] such mathematical inexactitude has not been held to be a sufficient basis upon which to invalidate social welfare legislation. *See Termini v. Califano*, 611 F.2d 367, 370 (2d Cir. 1979); *Gilchrist v. Harris*, 493 F.Supp. 859, 864 (S.D.N.Y.1980). *See also Califano v. Aznavorian*, 439 U.S. 170, 174, 99 S.Ct. 471, 473, 58 L.Ed.2d 435 (1978). In the final analysis, plaintiffs' constitutional challenges can be reduced to the single contention that they are dissatisfied with the method of reimbursement for capital costs adopted by IDPA and approved by HHS. However, standing alone, this is an insufficient basis upon which to invalidate the amended state plan which otherwise complies with federal statutory, regulatory, and constitutional requirements.

Accordingly, defendants' motion for summary judgment is hereby granted and plaintiffs' motion for summary judgment is denied for the reasons set forth in this opinion. It is so ordered.

---

**12.** "The selection of July 1, 1977, as the date for handling capital costs under the cost-related plan techniques came about as state officials recognized that ordinary market pressures no longer existed [after that date]." Defendants' Answers to Plaintiffs' First Set of Interrogatories at 4. The distortion of ordinary market pressures in the nursing home industry has already been discussed in detail in Part I of this opinion, *supra*.