385

GARY W. MOEHLE *et al.* (formerly Washington Nursing Center, Inc.), Plaintiffs-Appellees, v. JEFFREY C. MILLER, Acting Director, The Department of Public Aid, Defendant-Appellant.

Third District   No. 3—87—0039

Opinion filed September 16, 1987.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and James C. O'Connell and Karen Konieczny, Assistant Attorneys General, of Chicago, of counsel), for appellant.

Melvin O. Moehle, of Moehle, Swearingen & Associates, Ltd., of Washington, for appellees.

JUSTICE SCOTT delivered the opinion of the court:
Washington Nursing Center, Inc., operated a nursing home in Washington, Illinois, which it leased from Washington Americana, Inc. Washington Nursing Center received revenue for services from the Illinois Department of Public Aid (hereinafter the Department) under the Federal Medicaid program administered by the Department. Following transfers of stock in Washington Americana in 1976 and 1977, the owners of the nursing home applied to the Department for a new reimbursement rate under the Medicaid program. The Department denied the request, a denial that was reversed on review by the circuit court of Tazewell County. The Department now seeks appellate reconsideration of the circuit court's order of reversal.

Until June 30, 1975, the officers and directors of Washington Nursing Center, Inc., were Florence L. Baltz, Max H. Baltz and Melvin O. Moehle. Until July 1, 1976, the shareholders of Washington Americana, Inc., were Florence L. Baltz, Max H. Baltz and Melvin O. Moehle. On July 1, 1976, Melvin O. Moehle and Lorraine N. Moehle

purchased all the shares of Washington Americana which were owned by Florence L. Baltz and Max H. Baltz, and thereafter the Moehles were the sole owners of all the issued and outstanding shares of the corporation. On January 7, 1977, Washington Americana was dissolved and the real estate owned by the corporation was deeded to the Moehles as tenants in common. The Moehles had previously taken control of the Washington Nursing Center shares owned by the Baltzes.

On January 4, 1978, Melvin O. Moehle requested the Department to recalculate the capital rate established for Washington Nursing Center, Inc., contending that the stock sale and subsequent liquidation of the Washington Americana corporation should result in an increase in the capital cost reimbursement allowed by the Department with respect to the Washington Nursing facility. The Department refused any change in the reimbursement amount allowed to the nursing center, citing Illinois Department of Public Aid (IDPA) Rule 4.143 (August 4, 1978).

On May 4, 1979, Washington Nursing Center filed a complaint for declaratory judgment in the circuit court of Tazewell County. That complaint sought a judicial finding that the transactions in 1976 and 1977 were a change of ownership and that 1977 was the base year the Department was required to use in computing the nursing facility's capital cost reimbursement. The circuit court, on a motion for summary judgment, found in favor of the plaintiffs-appellees and against the Department. The Department prosecuted the instant appeal.

It is helpful to an understanding of this case to reiterate the Federal program here involved—Medicaid—and to expressly state the program not involved—Medicare. The latter "is a federally sponsored program in which the federal government enters into a *direct* relationship with the private health care provider. Medicaid is also a federally sponsored program. However, it is distinguished from Medicare by the active participation of the states as middlemen in the payment procedure. Under Medicaid, the state, not the federal government, enters into a direct agreement with a local health care provider. The federal government's involvement is limited to reimbursing the state for a portion of its expenses." (Emphasis in original.) *Woodstock/ Kenosha Health Center v. Bowen* (7th Cir. 1987), 810 F.2d 123, 124.

"The Medicaid Program embodied in Title XIX of the Social Security Act, 42 U.S.C. Sec. 1396 et. seq., provides for a partnership between federal and state government designed to share the cost of medical services to needy individuals with limited incomes and resources. Under Title XIX, a state must des-

ignate 'a single state agency to administer or to supervise the administration of the [state Medicaid] plan.' [Citation.] That state agency then draws up a medical assistance plan consistent with the guidelines contained in Title XIX and the regulations promulgated thereunder and submits it to the Department of Health and Human Services (HHS) for approval. Upon approval of the plan by HHS, the state becomes eligible for federal matching funds for reimbursement of the cost of specific types of medical assistance. [Citation.]

In 1972, Congress amended the existing Medicaid legislation to provide for reimbursement of skilled and intermediate nursing care facilities on a 'reasonable cost related basis' for services rendered to Medicaid recipients. [Citation.] The 1972 amendment 'was apparently a result of Congressional displeasure with widespread state endorsement of flat rate payment systems which were perceived as failing to bring about quality care and the efficient, economical provision of such service.' [Citation.] By providing for payment on a 'reasonable cost related basis' in 42 U.S.C. Sec. 1396a(a)(13)(E) rather than payment of the 'reasonable cost' of services as provided in 42 U.S.C. Sec. 1396a(a)(13)(D) Congress intended to give states greater flexibility in formulating reimbursement methods that would assure quality care for low income nursing home residents while also controlling the spiraling costs of Medicaid." *Illinois Council for Long Term Care v. Miller* (N.D. Ill. 1980), 503 F. Supp. 1091, 1092-93.

The State of Illinois developed its own reimbursement methods utilizing the latitude offered by the Federal code. Specifically, the Illinois formula did not require the reimbursement of each institution's actual cost, but rather categorized nursing care institutions into classes according to age and provided that reimbursement would be the same for each class. The Department adopted this approach

"to prevent 'trafficking' or 'pyramiding' in nursing homes, a practice that apparently had become quite widespread in the industry. Studies of the nursing home industry had revealed that there was a substantial secondary market in nursing homes whereby nursing home operators would sell their facilities to each other at prices well in excess of construction costs in order to obtain increased reimbursement for capital costs. Basing reimbursement on such increased sales 'costs' does nothing to upgrade the quality of care available to the low income residents of the facility who are to be the ultimate beneficiaries of

Medicaid. Rather, in such circumstances, reimbursement of actual capital costs creates an incentive to engage in sham transactions in which the buyer, assured of full capital cost reimbursement from the state, is willing to pay an inflated price for the nursing facility with no corresponding commitment to upgrade the standard of care provided by the facility. The cut-off date of July 1, 1977, was selected by [the Department] as the date after which capital costs would be handled differently because of the agency's perception that ordinary market pressures no longer existed as of that time." (*Illinois Council for Long Term Care v. Miller* (N.D. Ill. 1980), 503 F. Supp. 1091, 1097.)

Specifically, the Department rules provide for the reimbursement of capital costs to nursing home operators on a group basis related to a base year:

"(1) For facilities built or purchased prior to July 1, 1977, the later of year of construction or year of purchase;

(2) For facilities built July 1, 1977, or later, the year of construction;

(3) For facilities purchased on or after July 1, 1977, the base year established under (1) above will not change." IDPA Rule 4.14 (December 30, 1977).

Further, in determining when a nursing home facility has been purchased, "[a] change of corporate stock ownership does not constitute a change in ownership." IDPA Rule 4.143 (August 4, 1978).

In urging the affirmance of the circuit court decision, the plaintiffs-appellees assert that the lower court properly found that 1977 should be used as the case year for determining capital cost reimbursement for the Washington Nursing Center under the Medicaid program. We believe that conclusion ignores the clear direction of the rules adopted by the Department. Those rules are entitled to substantial deference. (*Illinois Council for Long Term Care v. Miller* (N.D. Ill. 1980), 503 F. Supp. 1091.) Those rules provide for a reimbursement formula which is related to reasonable costs, but which does not necessarily provide for the total reimbursement of all actual costs. Since Federal law was intended to provide states with flexibility in devising reimbursement formulas, and since the Illinois formula is a good-faith attempt to address other legitimate public policy concerns, we agree with other courts which have concluded that the Illinois reimbursement formula, and the Department rules which fashion that formula, are valid and govern the outcome of this dispute.

We cannot agree that the Department rules are contrary to the

holdings of *Pacific Coast Medical Enterprises v. Harris* (9th Cir. 1980), 633 F.2d 123, *Memorial, Inc. v. Harris* (9th Cir. 1980), 655 F.2d 905, and *West Seattle General Hospital, Inc. v. United States* (Ct. Cl. 1981), 674 F.2d 899, a proposition urged by the plaintiffs-appellees. Those cases involve the Medicare program—and the statutes and regulations for the Medicaid program are not the same. Likewise, the plaintiffs-appellees' citation of *Crestview Manor v. Iowa Department of Social Services* (Iowa App. 1979), 287 N.W.2d 890, and *Chateau Gardens, Inc. v. Harris* (E.D. Mich. 1980), 497 F. Supp. 133, is not persuasive since these decisions interpret the Medicaid plan of other States, namely Iowa and Michigan, not the reimbursement plan of Illinois. Unless those States had adopted the same formula for reimbursement by class, we do not believe those authorities are contrary to the instant decision.

The plaintiffs-appellees suggest that the Department rules are contrary to the statutory authority given to the Department under State law. That authority is set forth, in part, in the Illinois Public Aid Code (Ill. Rev. Stat. 1979, ch. 23, par. 5—5.3). We note that the Department is required to "take account of the actual costs," but to reimburse not actual costs, but "a reasonable cost related basis." (Ill. Rev. Stat. 1979, ch. 23, par. 5—5.3.) Accordingly, we must conclude that Illinois lawmakers, like those in Congress, intended to sacrifice some of the precision in cost reimbursement embodied in the Medicare "reasonable cost" formula for the flexibilities of the "reasonable cost related" formula.

We concur with the original reimbursement decision rendered by the Department. The contrary decision of the circuit court of Tazewell County is reversed.

Reversed.

STOUDER and WOMBACHER, JJ., concur.